Filed 11/16/17
Opinion on remand from Supreme Court

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| CLEVELAND NATIONAL FOREST FOUNDATION et al., Plaintiffs and Appellants, v. SAN DIEGO ASSOCIATION OF GOVERNMENTS et al., Defendants and Appellants; THE PEOPLE, Intervenor and Appellant. | D063288 (Super. Ct. No. 37-2011-00101593-CU-TT-CTL) |
| CREED-21 et al., Plaintiffs and Appellants, v. SAN DIEGO ASSOCIATION OF GOVERNMENTS et al., Defendants and Appellants; THE PEOPLE, Intervenor and Appellant. | (Super. Ct. No. 37-2011-00101660-CU-TT-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County,

Timothy B. Taylor, Judge.  Judgment reversed in part, affirmed in part, modified in part,

and remanded with directions.

The Sohagi Law Group, Margaret M. Sohagi, Philip A. Seymour; and Julie D. Wiley for Defendants and Appellants San Diego Association of Governments et al.

Kamala D. Harris, Attorney General, Timothy R. Patterson and Janill L. Richards, Deputy Attorneys General, for Intervenor and Appellant.

Shute, Mihaly & Weinberger, Rachel B. Hooper, Amy J. Bricker, Erin B. Chalmers; Daniel P. Selmi; Coast Law Group, Marco Gonzalez; Kevin P. Bundy; and Cory J. Briggs for Plaintiffs and Appellants Cleveland National Forest et al.

I

INTRODUCTION

A

After the San Diego Association of Governments (SANDAG) certified an environmental impact report (EIR) for its 2050 Regional Transportation Plan/Sustainable Communities Strategy (transportation plan), CREED-21 and Affordable Housing Coalition of San Diego filed a petition for writ of mandate challenging the EIR's adequacy under the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.).[1] Cleveland National Forest Foundation and the Center for Biological Diversity filed a similar petition, in which Sierra Club and the People later joined.

---

[1] Further statutory references are also to the Public Resources Code unless otherwise stated.

The superior court granted the petitions in part, finding the EIR failed to carry out its role as an informational document because it did not analyze the inconsistency between the state's policy goals reflected in Executive Order S-3-05 (Executive Order) and the transportation plan's greenhouse gas emissions impacts after 2020. The court also found the EIR failed to adequately address mitigation measures for the transportation plan's greenhouse gas emissions impacts. Given these findings, the court declined to decide any of the other challenges raised in the petitions.

SANDAG appealed, contending the EIR complied with CEQA in both respects. Cleveland National Forest Foundation and Sierra Club (collectively, Cleveland) cross-appealed, contending the EIR further violated CEQA by failing to analyze a reasonable range of project alternatives, failing to adequately analyze and mitigate the transportation plan's air quality impacts, and understating the transportation plan's impacts on agricultural lands. The People separately cross-appealed, contending the EIR further violated CEQA by failing to adequately analyze and mitigate the transportation plan's impacts from particulate matter pollution.

A majority of this court concluded the EIR failed to comply with CEQA in all identified respects. (*Cleveland National Forest Foundation v. San Diego Assn. of Governments* (Nov. 24, 2014, D063288) [nonpub. opn.] (*Cleveland I*).)

B

The California Supreme Court granted review on the sole issue of whether the EIR should have analyzed the transportation plan's impacts against the greenhouse gas emission reduction goals in the Executive Order. (*Cleveland National Forest Foundation*

3

*v. San Diego Assn. of Governments* (2017) 3 Cal.5th 497, 503–504, 510 (*Cleveland II*).) The Supreme Court concluded, "The EIR sufficiently informed the public, based on the information available at the time, about the [transportation] plan's greenhouse gas impacts and its potential inconsistency with state climate change goals. Nevertheless, we do not hold that the analysis of greenhouse gas impacts employed by SANDAG in this case will necessarily be sufficient going forward. CEQA requires public agencies like SANDAG to ensure that such analysis stay in step with evolving scientific knowledge and state regulatory schemes." (*Cleveland II*, at p. 504.)

Consequently, the Supreme Court reversed this court's judgment "insofar as it determined that the [EIR's] analysis of greenhouse gas emission impacts rendered the EIR inadequate and required revision." (*Cleveland II*, *supra*, 3 Cal.5th at p. 519.) The Supreme Court did not grant review of this court's other holdings nor did it express how, if at all, its opinion affected their disposition. (*Ibid.*) The Supreme Court remanded the matter to this court for further proceedings consistent with the Supreme Court's opinion. (*Ibid.*)

C

Cleveland and the People filed supplemental opening briefs (Cal. Rules of Court, rule 8.200(b)(1)) requesting this court revise its decision in *Cleveland I* by removing the discussion of the adequacy of the EIR's analysis of the transportation plan's greenhouse gas emissions impacts and consistency with the Executive Order, and replacing the discussion with a reference to the Supreme Court's decision on this issue. Cleveland and

4

the People further requested this court keep the remainder of the decision substantially intact and publish it as revised.[2]

SANDAG did not file a supplemental opening brief, but SANDAG filed a supplemental responding brief (Cal. Rules of Court, rule 8.200(b)(1)). In its brief, SANDAG did not assert the Supreme Court's decision in *Cleveland II* affected any of this court's other holdings in *Cleveland I.* Instead, SANDAG asserted the case is moot because the EIR and the transportation plan have been superseded by more recent versions, which Cleveland and the People have not challenged. SANDAG also asserted the EIR and transportation plan will be superseded once more by another EIR and transportation plan currently being prepared.

Cleveland and the People dispute the EIR has been superseded and is legally ineffective.[3] They further contend that, even if this case were technically moot, the EIR's analytical errors are capable of repetition and could evade review because SANDAG must update the transportation plan every four years.

We agree with Cleveland and the People that SANDAG has not established this case is moot. "[A] moot case is one in which there may have been an actual or ripe

---

[2]    As Cleveland notes, under current court rules, the Supreme Court's grant of review would not have affected the publication status of *Cleveland I.* (Cal. Rules of Court, rules 8.1105(e)(1)(B), 8.1115(e).)

[3]    In *Cleveland II*, the Supreme Court granted the People's request to judicially notice the fact SANDAG had updated the transportation plan in 2015 and included some analysis of the transportation plan's consistency with the Executive Order. (*Cleveland II*, *supra*, 3 Cal.5th at pp. 510–511.)

5

controversy at the outset, but due to intervening events, the case has lost that essential character and, thus, no longer presents a viable context in which the court can grant effectual relief to resolve the matter." (*Association of Irritated Residents v. Department of Conservation* (2017) 11 Cal.App.5th 1202, 1222.) While there is evidence in the record suggesting SANDAG prepared different environmental review documents for the 2015 version of the transportation plan, there is no evidence indicating the EIR at issue in this case has been decertified and can no longer be relied upon for the current version or future versions of the transportation plan, or for projects encompassed with the transportation plan. Additionally, while there is evidence suggesting the environmental review documents associated with the 2015 version of the transportation plan may have addressed this court's concerns about the EIR's greenhouse gas emissions impacts analysis, there is no evidence indicating these environmental review documents addressed this court's concerns about any of the EIR's other analytical deficiencies. Consequently, on this record, it appears this case may still be able to provide Cleveland and the People with effective relief because correcting the defects in the EIR may result in modifications to the current version or future versions of the transportation plan, or to projects encompassed within the transportation plan.[4] (See *Woodward Park Homeowners Assn. v. Garreks, Inc.* (2000) 77 Cal.App.4th 880, 888.)

---

[4] SANDAG will have an opportunity to demonstrate whether and how it may have already addressed the EIR's identified deficiencies when it submits its return to the peremptory writ of mandate. (§ 21168.9, subd. (b) ["The trial court shall retain jurisdiction over the public agency's proceedings by way of a return to the peremptory writ until the court has determined that the public agency has complied with [CEQA]"].)

6

Even if this case were moot, its falls within the exception for cases "present[ing] important questions of continuing public interest that may evade review" because of the frequency with which SANDAG must update the transportation plan (see part II.B.1.b, *post*) as well as the nature of a program EIR and the associated limits on future environmental review (see part II.A.2, *post*). (*California Cannabis Coalition v. City of Upland* (2017) 3 Cal.5th 924, 933; *Cleveland II*, *supra*, 3 Cal.5th at p. 511; *Peterson v. City of San Diego* (1983) 34 Cal.3d 225, 227.) We, therefore, exercise our discretion to once again address the issues presented in this appeal that were not reviewed or decided by the Supreme Court in *Cleveland II*. (*California Cannabis Coalition v. City of Upland*, *supra*, at p. 933.)

II

DISCUSSION

A

1

*General Role of an EIR*

"The Legislature has made clear that an EIR is 'an informational document' and that '[t]he purpose of an environmental impact report is to provide public agencies and the public in general with detailed information about the effect which a proposed project is likely to have on the environment; to list ways in which the significant effects of such a project might be minimized; and to indicate alternatives to such a project.' " (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376,

7

391 (*Laurel Heights*); Guidelines, § 15002.)[5] "The EIR is the primary means of achieving … the policy of this state to 'take all action necessary to protect, rehabilitate, and enhance the environmental quality of the state.' [Citation.] The EIR is therefore 'the heart of CEQA.' [Citations.] An EIR is an 'environmental "alarm bell" whose purpose it is to alert the public and its responsible officials to environmental changes before they have reached ecological points of no return.' [Citations.] The EIR is also intended 'to demonstrate to an apprehensive citizenry that the agency has, in fact, analyzed and considered the ecological implications of its action.' [Citations.] Because the EIR must be certified or rejected by public officials, it is a document of accountability. If CEQA is scrupulously followed, the public will know the basis on which its responsible officials either approve or reject environmentally significant action, and the public, being duly informed, can respond accordingly to action with which it disagrees. [Citations.] The EIR process protects not only the environment but also informed self-government." (*Laurel Heights*, *supra*, at p. 392; accord, *Cleveland II*, *supra*, 3 Cal.5th at p. 511.)

---

5       All references to Guidelines are to the CEQA Guidelines, which are located in title 14 of the California Code of Regulations beginning at section 15000. "In interpreting CEQA, we accord the Guidelines great weight except where they are clearly unauthorized or erroneous." (*Neighbors for Smart Rail v. Exposition Metro Line Construction Authority* (2013) 57 Cal.4th 439, 448, fn. 4 (*Smart Rail*).)

8

*Role of a Program EIR*

The EIR at issue in this case is a program EIR.  A "program EIR is an EIR which may be prepared on a series of actions that can be characterized as one large project" and are related in specified ways.  (Guidelines, § 15168, subd. (a); *Town of Atherton v. California High-Speed Rail Authority* (2014) 228 Cal.App.4th 314, 343 (*Atherton*).)  The use of a program EIR can:  "(1) Provide an occasion for a more exhaustive consideration of effects and alternatives than would be practical in an EIR on an individual action, [¶] (2) Ensure consideration of cumulative impacts that might be slighted in a case-by-case analysis, [¶] (3) Avoid duplicative reconsideration of basic policy considerations, [¶] (4) Allow the lead agency to consider broad policy alternatives and program wide mitigation measures at an early time when the agency has greater flexibility to deal with basic problems or cumulative impacts, [and] [¶] (5) Allow reduction in paperwork." (Guidelines, § 15168, subd. (b); *Atherton*, *supra*, at pp. 343–344.)

"[W]here an agency prepares a 'program EIR' for a broad policy document …, Guidelines section 15168, subdivision (c)(2) allows agencies to limit future environmental review for later activities that are found to be 'within the scope' of the program EIR."  (*Latinos Unidos de Napa v. City of Napa* (2013) 221 Cal.App.4th 192, 196; accord, *Citizens Against Airport Pollution v. City of San Jose* (2014) 227 Cal.App.4th 788, 801–802.)  Further environmental review for such activities is required only where "(a) Substantial changes are proposed in the project which will require major revisions of the [EIR].  [¶] (b) Substantial changes occur with respect to the

circumstances under which the project is being undertaken which will require major revisions in the [EIR].  [¶] (c) New information, which was not known or could not have been known at the time the [EIR] was certified as complete, becomes available." (§ 21166; *May v. City of Milpitas* (2013) 217 Cal.App.4th 1307, 1325–1326; accord, *Citizens Against Airport Pollution v. City of San Jose*, *supra*, at p. 802.)

Because of these limitations, once an EIR is finally approved, a court generally cannot compel an agency to perform further environmental review for any known or knowable information about the project's impacts omitted from the EIR.  (*Citizens Against Airport Pollution v. City of San Jose*, *supra*, 227 Cal.App.4th at pp. 807–808; *Citizens for Responsible Equitable Environmental Development v. City of San Diego* (2011) 196 Cal.App.4th 515, 531–532.)  A court also generally cannot compel an agency to perform further environmental review if new regulations or guidelines for evaluating the project's impacts are adopted in the future.  (*Concerned Dublin Citizens v. City of Dublin* (2013) 214 Cal.App.4th 1301, 1320; *Fort Mojave Indian Tribe v. Department of Health Services* (1995) 38 Cal.App.4th 1574, 1605.)

Hence, "[d]esignating an EIR as a program EIR … does not by itself decrease the level of analysis otherwise required in the EIR.  'All EIR's must cover the same general content.  [Citations.]  The level of specificity of an EIR is determined by the nature of the project and the "rule of reason" [citation], rather than any semantic label accorded to the EIR.' "  (*Friends of Mammoth v. Town of Mammoth Lakes Redevelopment Agency* (2000) 82 Cal.App.4th 511, 533.)  Consequently, in considering a challenge to a program EIR, "it is unconstructive to ask whether the EIR provided 'project-level' as opposed to

10

'program-level' detail and analysis.  Instead, we focus on whether the EIR provided 'decision makers with sufficient analysis to intelligently consider the environmental consequences of [the] project.' "  (*Citizens for a Sustainable Treasure Island v. City and County of San Francisco* (2014) 227 Cal.App.4th 1036, 1052.)

3

*Standard of Review in CEQA Cases*[6]

"[I]n a CEQA case, as in other mandamus cases, [our review] is the same as the trial court's:  [we review] the agency's action, not the trial court's decision; in that sense [our review] is de novo.  (*Vineyard*, *supra*, 40 Cal.4th at p. 427.)  However, our inquiry extends " 'only to whether there was a prejudicial abuse of discretion.' ([§ 21168.5].)" (*Vineyard*, at p. 426.)

"[A]n agency may abuse its discretion under CEQA either by failing to proceed in the manner CEQA provides or by reaching factual conclusions unsupported by substantial evidence.  (§ 21168.5.)  Judicial review of these two types of error differs

[6]     The California Supreme Court is currently reviewing the standard and scope of judicial review under CEQA.  (*Sierra Club v. County of Fresno* (2014) 226 Cal.App.4th 704 [172 Cal.Rptr.3d 271], review granted Oct. 1, 2014, S219783.)  Pending further guidance, we endeavor to apply the review dichotomy most recently articulated by the Supreme Court.  (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 426–427, 435 (*Vineyard*); accord, *Banning Ranch Conservancy v. City of Newport Beach* (2017) 2 Cal.5th 918, 935; *Center for Biological Diversity v. Department of Fish & Wildlife* (2015) 62 Cal.4th 204, 214–215; *Save Tara v. City of West Hollywood* (2008) 45 Cal.4th 116, 131; *In re Bay-Delta etc.* (2008) 43 Cal.4th 1143, 1161–1162 (*Bay-Delta*); *Ebbetts Pass Forest Watch v. California Dept. of Forestry & Fire Protection* (2008) 43 Cal.4th 936, 944.)

significantly:  While we determine de novo whether the agency has employed the correct procedures, 'scrupulously enforc[ing] all legislatively mandated CEQA requirements' [citation], we accord greater deference to the agency's substantive factual conclusions." (*Vineyard*, *supra*, 40 Cal.4th at p. 435.)  "In evaluating an EIR for CEQA compliance, then, [we] must adjust [our] scrutiny to the nature of the alleged defect, depending on whether the claim is predominantly one of improper procedure or a dispute over the facts. For example, where an agency failed to require an applicant to provide certain information mandated by CEQA and to include that information in its environmental analysis, … the agency 'failed to proceed in the manner prescribed by CEQA.' [Citations.]  In contrast, in a factual dispute over 'whether adverse effects have been mitigated or could be better mitigated' [citation], the agency's conclusion would be reviewed only for substantial evidence." (*Ibid*.)

B

*Appeal*

1

*Background*

a

In 2005 then Governor Arnold Schwarzenegger issued the Executive Order establishing greenhouse gas emissions reduction targets for California.[7]  Specifically, the

---

[7]     "[A]n executive order is generally regarded as 'a formal written directive of the Governor.' "  (75 Ops.Cal.Atty.Gen. 263 (1992).)

Executive Order required reduction of greenhouse gas emissions to 2000 levels by 2010, to 1990 levels by 2020, and to 80 percent below 1990 levels by 2050.

The Legislature subsequently enacted the California Global Warming Solutions Act of 2006 (Health & Saf. Code, § 38500 et seq.), referred to by the parties as Assembly Bill No. 32 (2005–2006 Reg. Sess.) (Assembly Bill 32). Among its provisions, Assembly Bill 32 tasked the California State Air Resources Board (CARB) with determining the state's 1990 greenhouse gas emissions level and approving an equivalent emissions level to be achieved by 2020. (Health & Saf. Code, § 38550.)

The Legislature intended for the emissions limit to "continue in existence and be used to maintain and continue reductions in emissions of greenhouse gases beyond 2020." (Health & Saf. Code, § 38551, subd. (b).) The Legislature also intended for the emissions limit to work in concert with other environmental protection laws, expressly stating Assembly Bill 32 does not "relieve any person, entity, or public agency of compliance with other applicable federal, state, or local laws or regulations, including state air and water quality requirements, and other requirements for protecting public health or the environment." (Health & Saf. Code, § 38592, subd. (b).)

The Legislature also enacted the Sustainable Communities and Climate Protection Act of 2008 (Stats. 2008, ch. 728; Stats. 2009, ch. 354, § 5), referred to by the parties as Senate Bill No. 375 (2007–2008 Reg. Sess.) (Senate Bill 375). In enacting Senate Bill 375, the Legislature found automobiles and light trucks are responsible for 30 percent of the state's greenhouse gas emissions. (Stats. 2008, ch. 728, § 1(a).) Accordingly, Senate Bill 375 directed CARB to develop regional greenhouse gas emission reduction targets

13

for automobiles and light trucks for 2020 and 2035.  (Gov. Code, § 65080, subd. (b)(2)(A).)  The targets established by CARB for the San Diego region require a 7 percent per capita reduction in carbon dioxide emissions by 2020 and a 13 percent per capita reduction by 2035 (compared to a 2005 baseline).[8]  CARB must update these targets every eight years until 2050, and may update the targets every four years based on changing factors.  (Gov. Code, § 65080, subd. (b)(2)(A)(iv).)

More recently, while this case was pending before the Supreme Court, the Legislature "enacted Senate Bill 32 (2015–2016 Reg. Sess.), adding Health and Safety Code section 38566, which adopts a goal of reducing greenhouse gas emissions by 40 percent below 1990 levels by the year 2030.  ... The legislation directs CARB to craft regulations to implement its goal.  (Health & Saf. Code, § 38566.)  These regulations may further clarify the way forward for public agencies to meet the state's 2050 climate goals."  (*Cleveland II*, *supra*, 3 Cal.5th at p. 518–519.)

b

The transportation plan, which SANDAG must prepare every four years (23 U.S.C. § 134(c); Gov. Code, § 65080, subds. (a) & (d)), "serves as the long-range plan designed to coordinate and manage future regional transportation improvements, services, and programs among the various agencies operating within the San Diego region."  In enacting Senate Bill 375, the Legislature found the state's emissions

---

[8]     The transportation plan meets these limited scope targets.

14

reductions goals cannot be met without improved land use and transportation policy. Consequently, Senate Bill 375 (Gov. Code, § 65080, subd. (b)(2)(B)) mandates the transportation plan include a sustainable communities strategy to, as the EIR states, "guide the San Diego region toward a more sustainable future by integrating land use, housing, and transportation planning to create more sustainable, walkable, transit-oriented, compact development patterns and communities that meet [CARB's greenhouse gas] emissions targets for passenger cars and light-duty trucks." Once the sustainable communities strategy is approved, some transit priority projects consistent with the strategy are exempt from CEQA requirements. Other transit priority projects, residential projects, and mixed-use projects consistent with the strategy are subject to streamlined CEQA requirements. (§§ 21155–21155.4, 21159.28; Guidelines, § 15183.3.)

2

*Analysis of Greenhouse Gas Emissions Impacts*

The EIR analyzed the transportation plan's greenhouse gas emissions impacts against three significance thresholds for each of the planning years 2020, 2035, and 2050. Under the first threshold, the EIR posited the transportation plan's impacts would be significant if the transportation plan's implementation were to increase greenhouse gas emissions compared to existing, or 2010, conditions. Under the second threshold, the EIR posited the transportation plan's impacts would be significant if the transportation plan's implementation conflicted with CARB's regional automobile and light truck emissions reductions targets. Under the third threshold, the EIR stated the transportation plan's impacts would be significant if the transportation plan's implementation conflicted

15

with either CARB's climate change scoping plan (Scoping Plan) or SANDAG's own Climate Action Strategy.[9]

The EIR concluded the transportation plan's greenhouse gas emissions impacts would be significant under the first significance threshold for the 2035 and 2050 planning years because the emissions would be higher in those planning years than in 2010. The EIR concluded the greenhouse gas emissions impacts would be less than significant in all other respects analyzed.[10]

The Supreme Court concluded SANDAG did not abuse its discretion in the manner in which SANDAG chose to analyze the transportation plan's impacts. (*Cleveland II*, *supra*, 3 Cal.5th at p. 518.) Nevertheless, the Court cautioned its conclusion did not mean the EIR's analysis could "serve as a template for future EIRs. Under CEQA, '[t]he determination of whether a project may have a significant effect on the environment calls for careful judgment on the part of the public agency involved,

---

[9] The Scoping Plan is CARB's roadmap for achieving greenhouse gas emissions reductions. The Climate Action Strategy is SANDAG's guide for addressing climate change. The Climate Action Strategy emphasizes the areas where the greatest impact can be made at the local level, including transportation infrastructure.

[10] The People and Cleveland have not challenged these conclusions and their propriety is not before us. Nonetheless, regarding the third significance threshold, we note the Climate Action Strategy expresses far stronger views than the transportation plan on the steps necessary to achieve the state's long-term greenhouse gas emissions reductions goals. For example, the Climate Action Strategy maintains achieving the goals "will require fundamental changes in policy, technology, and behavior" and "[b]y 2030, the region must have met and gone below the 1990 [emissions] level and be well on its way to doing its share for achieving the 2050 greenhouse gas reduction level."

16

based to the extent possible on scientific and factual data.'  (Guidelines, § 15064, subd. (b).)  As more and better data become available, analysis of the impact of regional transportation plans on greenhouse gas emissions will likely improve.  ... A regional planning agency like SANDAG, charged with assisting the implementation of the state's climate goals, must straightforwardly address in the relevant environmental review documents whether its regional transportation plan as a whole is in accord with those goals."  (*Cleveland II*, *supra*, at p. 518.)

3

*Mitigation of Greenhouse Gas Emissions Impacts*

a

To mitigate the significant greenhouse gas emissions impacts found under the first threshold, the EIR identified three mitigation measures it deemed feasible.[11]  The first mitigation measure required SANDAG to update its future regional comprehensive plans, regional transportation plans, and sustainable communities plans to incorporate policies and measures leading to reduced greenhouse gas emissions.  The second mitigation measure encouraged the San Diego region cities and the County of San Diego (County) to adopt and implement climate action plans for reducing greenhouse gas emissions to a level the particular city or the County determined would not be cumulatively

---

[11]     " 'Feasible' means capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, legal, social, and technological factors."  (Guidelines, § 15364.)

17

considerable.  The second mitigation measure also identified various provisions the plans should include and stated SANDAG would assist in the preparation of the plans and other climate strategies through the continued implementation of its own Climate Action Strategy and energy roadmap program.[12]  The third mitigation measure stated SANDAG would and other agencies should require the use of best available control technology to reduce greenhouse gas emissions during the construction and operation of projects.

According to the EIR, these mitigation measures encourage reduction in greenhouse gas emissions, but they do not provide a mechanism guaranteeing such reductions.  Consequently, the EIR concluded the significant impacts found under the first threshold would remain significant and unavoidable.

The EIR also considered and rejected three other mitigation measures deemed infeasible.  These mitigation measures were:  (1) requiring all vehicles driven within the region to be zero-emission vehicles or to be powered by renewable energy; (2) requiring all future construction to be net-zero energy use; and (3) requiring all future construction activity to include only equipment retrofitted to significantly reduce greenhouse gas emissions.

---

[12]    According to the record, the energy roadmap program "identifies energy-saving measures that can be integrated into local planning and permitting processes, ordinances, outreach and education efforts, and municipal operations."

b

SANDAG contends the EIR adequately addressed mitigation for the transportation plan's significant greenhouse gas emissions impacts.  As this contention is predominately factual, our review is for substantial evidence.  (*Vineyard*, *supra*, 40 Cal.4th at p. 435.)

i

"The core of an EIR is the mitigation and alternatives sections."  (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 564; *Watsonville Pilots Assn. v. City of Watsonville* (2010) 183 Cal.App.4th 1059, 1089.)  "Section 21002 requires agencies to adopt feasible mitigation measures to substantially lessen or avoid otherwise significant adverse environmental impacts.  [¶] The CEQA guidelines state that to be legally adequate mitigation measures must be capable of:  '(a) Avoiding the impact altogether by not taking a certain action or parts of an action.  (b) Minimizing impacts by limiting the degree or magnitude of the action and its implementation.  (c) Rectifying the impact by repairing, rehabilitating, or restoring the impacted environment.  (d) Reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action.'  [Citation.]

"For each significant effect, the EIR must identify specific mitigation measures; where several potential mitigation measures are available, each should be discussed separately, and the reasons for choosing one over the others should be stated.  If the inclusion of a mitigation measure would itself create new significant effects, these too, must be discussed, though in less detail than required for those caused by the project itself."  (*Sacramento Old City Assn. v. City Council* (1991) 229 Cal.App.3d 1011, 1027.)

19

For significant greenhouse gas emissions effects, feasible mitigation measures may include: "(1) Measures in an existing plan or mitigation program for the reduction of emissions that are required as part of the lead agency's decision; [¶] (2) Reductions in emissions resulting from a project through implementation of project features, project design, or other measures . . . ; [¶] (3) Off-site measures, including offsets that are not otherwise required, to mitigate a project's emissions; [¶] (4) Measures that sequester greenhouse gases; [¶] [and] (5) In the case of the adoption of a plan, such as a general plan, long range development plan, or plans for the reduction of greenhouse gas emissions, mitigation may include the identification of specific measures that may be implemented on a project-by-project basis. Mitigation may also include the incorporation of specific measures or policies found in an adopted ordinance or regulation that reduces the cumulative effect of emissions." (Guidelines, § 15126.4, subd. (c).)

ii

At one extreme, the EIR in this case considered and deemed feasible three measures requiring little to no effort to implement and assuring little to no concrete steps toward emissions reduction. In addition, according to the EIR, many of the suggestions contained in these measures have already been incorporated into the transportation plan and, by implication, the transportation plan's emissions estimates. "A 'mitigation measure' is a suggestion or change that would reduce or minimize significant adverse impacts on the environment caused by the project as proposed." (*Lincoln Place Tenants Assn. v. City of Los Angeles* (2007) 155 Cal.App.4th 425, 445.) A mitigation measure is not part of the project. (*Lotus v. Department of Transportation*, *supra*, 223 Cal.App.4th

20

at p. 656 & fn. 8.) Thus, it is questionable whether these measures even qualify as mitigation measures.

At the other extreme, the EIR considered and deemed infeasible three particularly onerous measures. Each of the measures would be difficult, if not impossible, to enforce and each requires implementation resources not readily available. Unrealistic mitigation measures, similar to unrealistic project alternatives, do not contribute to a useful CEQA analysis. (See *Watsonville Pilots Assn. v. City of Watsonville*, *supra*, 183 Cal.App.4th at p. 1089; 1 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act (Cont.Ed.Bar 2017) § 15.10.) As none of these measures had any probability of implementation, their inclusion in the EIR was illusory.

Missing from the EIR is what CEQA requires: a discussion of mitigation alternatives that could both substantially lessen the transportation plan's significant greenhouse gas emissions impacts and feasibly be implemented. (*Lincoln Place Tenants Assn. v. City of Los Angeles*, *supra*, 155 Cal.App.4th at p. 445.) A few examples of potential alternatives identified in the Climate Action Strategy include supporting the planning and development of smart growth areas through transportation investments and other funding decisions; offering incentives for transit-oriented developments in smart growth areas; coordinating the funding of low carbon transportation with smart growth development; and encouraging parking management measures that promote walking and transit use in smart growth areas. Given the absence of any discussion of such mitigation alternatives, we conclude there is not substantial evidence to support SANDAG's determination the EIR adequately addressed mitigation for the transportation plan's

21

greenhouse gas emissions impacts. The error is prejudicial because it precluded informed public participation and decisionmaking. (§ 21005, subd. (a); *City of Maywood*, *supra*, 208 Cal.App.4th at p. 386.)

C

*Cross-Appeals*

1

*Forfeiture*

The People's and Cleveland's pleadings and briefs below challenged many aspects of the EIR in addition to the EIR's analysis and mitigation of greenhouse gas emissions impacts. In its tentative ruling, the superior court acknowledged the other challenges, but determined it could resolve the case solely on the greenhouse gas emissions impacts analysis and mitigation issues and, consequently, it did not need to address the other challenges. The People and Cleveland through their cross-appeals now seek rulings from this court on many of the other challenges. SANDAG contends they forfeited these challenges by failing to attempt to obtain rulings on them below.

Even if SANDAG's contention were correct, the application of the forfeiture rule is not automatic and we may excuse forfeiture in cases presenting "an important legal issue." (*In re S.B.* (2004) 32 Cal.4th 1287, 1293.) We are persuaded the legal issues raised in the cross-appeals are sufficiently important we should exercise our discretion to excuse any forfeiture. Moreover, we are mindful of the Legislature's intent "that any court, which finds, or, in the process of reviewing a previous court finding, finds, that a

22

public agency has taken an action without compliance with [CEQA], shall specifically address each of the alleged grounds for noncompliance."  (§ 21005, subd. (c).)

2

*Project Alternatives*

a

The EIR analyzed seven project alternatives.  They were:

1.      A no-project alternative, which assumed the transportation plan would not be adopted and only transportation improvements under construction or development would be built (Alternative 1);

2.      A modified funding strategy alternative, which deleted some highway improvements, delayed other highway improvements, added some transit projects, advanced other transit projects, and increased some transit service frequencies (Alternative 2a);

3.      The same modified funding strategy alternative coupled with a modified "smart growth" land use pattern, which assumed added infill and redevelopment to increase residential development density in urban and town center areas and increased employment within job centers (Alternative 2b);

4.      A transit emphasis alternative, which advanced the development of some transit projects, but did not add any new transit projects (Alternative 3a);

5.      The same transit emphasis alternative, but assuming the modified smart growth land use pattern (Alternative 3b);

23

6. An alternative implementing the transportation plan's transportation network, but assuming the modified smart growth land use pattern (Alternative 4); and

7. A slow growth alternative, which assumed the application of regulations and/or economic disincentives to slow population and employment and delayed the complete implementation of the transportation plan by five years (Alternative 5).

b

Cleveland contends the EIR fails to comply with CEQA because the EIR did not analyze a reasonable range of project alternatives. As the focus of this contention is whether the analysis was reasonable and not whether it occurred, the contention presents a predominately factual question and our review is for substantial evidence. (*Vineyard*, *supra*, 40 Cal.4th at p. 435.)

"CEQA requires that an EIR, in addition to analyzing the environmental effects of a proposed project, also consider and analyze project alternatives that would reduce adverse environmental impacts. [Citations.] The [Guidelines] state that an EIR must 'describe a range of reasonable alternatives to the project … which would feasibly attain most of the basic objectives of the project but would avoid or substantially lessen any of the significant effects of the project … .' [Citation.] An EIR need not consider every conceivable alternative to a project or alternatives that are infeasible. [Citations.] [¶] . . . [¶]

" 'There is no ironclad rule governing the nature or scope of the alternatives to be discussed other than the rule of reason.' [Citation.] The rule of reason 'requires the EIR to set forth only those alternatives necessary to permit a reasoned choice' and to 'examine

24

in detail only the ones that the lead agency determines could feasibly attain most of the basic objectives of the project.' [Citations.] An EIR does not have to consider alternatives 'whose effect cannot be reasonably ascertained and whose implementation is remote and speculative.' " (*Bay-Delta*, *supra*, 43 Cal.4th at p. 1163.) A court will uphold the selection of project alternatives unless the challenger demonstrates " 'that the alternatives are manifestly unreasonable and that they do not contribute to a reasonable range of alternatives.' " (*California Native Plant Society v. City of Santa Cruz* (2009) 177 Cal.App.4th 957, 988.)

In this case, the EIR's discussion of project alternatives is deficient because it does not discuss an alternative which could significantly reduce total vehicle miles traveled. Although Alternatives 3a and 3b are labeled "transit emphasis" alternatives, the labeling is a misnomer. These alternatives mainly advance certain rapid bus projects, but leave the planned rail and trolley projects largely unchanged. In addition, these alternatives do not provide any new transit projects or significant service increases. In fact, the "transit emphasis" alternatives include fewer transit projects than some of the other non-"transit-emphasis" alternatives.

The omission of an alternative which could significantly reduce total vehicle miles traveled is inexplicable given SANDAG's acknowledgment in its Climate Action Strategy that the state's efforts to reduce greenhouse gas emissions from on-road transportation will not succeed if the amount of driving, or vehicle miles traveled, is not significantly reduced. The Climate Action Strategy explained, "Lowering vehicle miles traveled means providing high-quality opportunities to make trips by alternative means to

25

driving alone such as walking, bicycling, ridesharing, and public transit, and by shortening vehicle trips that are made. This can be accomplished through improved land use and transportation planning and related measures, policies and investments that increase the options people have when they travel." Accordingly, the Climate Action Strategy recommended policy measures to increase and prioritize funding and system investments for public transit and transit operations, increase the level of service on existing routes and provide new public transit service through expanded investments, and improve the performance of public transit with infrastructure upgrades. Given these recommendations, their purpose, and their source, it is reasonable to expect at least one project alternative to have been focused primarily on significantly reducing vehicle trips.

Instead, it appears the project alternatives focused primarily on congestion relief. The Climate Action Strategy provides evidentiary support for the consideration of congestion relief alternatives as it notes, "Eliminating or reducing congestion can lead to more efficient travel conditions for vehicles and greenhouse gas savings." However, the transportation plan is a long-term plan and congestion relief is not necessarily an effective long-term strategy. As the Climate Action Strategy explains, "Measures to relieve congestion also may induce additional vehicle travel during uncongested periods, particularly over the long-term, which can partially or fully offset the greenhouse gas reductions achieved in the short-term from congestion relief. Induced demand (sometimes called the rebound effect) in transportation refers to the increase in travel that can occur when the level of service on a roadway or other facility improves. Travelers sometimes respond to faster travel times and decreased costs of travel by traveling more,

26

resulting in increased vehicle miles traveled."  (Fns. omitted.)  Given the acknowledged long-term drawbacks of congestion relief alternatives, there is not substantial evidence to support the EIR's exclusion of an alternative focused primarily on significantly reducing vehicle trips.  The error is prejudicial because it precluded informed public participation and decisionmaking.  (§ 21005, subd. (a); *City of Maywood*, *supra*, 208 Cal.App.4th at p. 386.)

3

*Air Quality Impacts*

a

Eleven air quality monitoring stations throughout the region measure ambient air pollutant concentrations to determine whether the region's air quality meets federal and state standards.  The region does not meet the state standards for emissions of respirable particulate matter with an aerodynamic resistance diameter of 10 micrometers or less ($PM_{10}$) and fine particulate matter with an aerodynamic resistance diameter of 2.5 micrometers or less ($PM_{2.5}$).[13]  The EIR forecasted that the daily tonnage of on-road mobile emissions of $PM_{10}$ and $PM_{2.5}$ from the transportation plan's transportation network improvements would steadily and substantially increase from 2010 to 2050.  The EIR did not forecast whether there would be any increase in these emissions from regional growth

---

[13]   According to the EIR, "respirable" means the particulate matter can "avoid many of the human respiratory system defense mechanisms and enter deeply into the lung."

or land use changes associated with the transportation plan. Instead, the EIR indicated such forecasting would be done during the next tier of environmental review.

Five of the region's air quality monitoring stations also sample toxic air contaminants (TACs), which are contaminants known or suspected to cause cancer or serious health problems, but for which there are no federal or state ambient air quality standards. State law also requires facilities to report any emissions of TACs in order to quantify the amount released, the location of the release, the concentrations to which the public is exposed, and the resulting potential health risk. (Health & Saf. Code, § 44300 et seq.) In 2009, annual emissions of TACs in the region were estimated to be more than 64.9 million pounds.

According to the EIR, exposure to TACs can cause cancer and other serious health problems. This is especially true of exposure to diesel particulate matter, which is respirable. The EIR further explained, "The carcinogenic potential of TACs is a particular public health concern because many scientists currently believe that there is no 'safe' level of exposure to carcinogens. Any exposure to a carcinogen poses some risk of contracting cancer."

One of the thresholds the EIR used to determine the significance of the transportation plan's air quality impacts was whether sensitive receptors would be exposed to substantial pollutant concentrations. For purposes of this threshold, "sensitive receptors" included children, the elderly, and communities already experiencing high levels of air pollution and related diseases.

28

As to $PM_{10}$ and $PM_{2.5}$ emissions, the EIR indicated sensitive receptors could be significantly impacted if they were located near congested intersections. As to TACs, the EIR indicated TACs emitted from highway vehicles and nonroad equipment tend to impact those closest to the emission sources. The EIR explained, "[a] growing body of scientific evidence shows that living or going to school near roadways with heavy traffic volumes is associated with a number of adverse effects. These include increased respiratory symptoms, increased risk of heart and lung disease, and elevated mortality rates."

Although the EIR recognized regional growth and land use changes associated with the transportation plan had the potential to expose sensitive receptors to substantial localized pollutant concentrations, the EIR stated the level of exposure could not and would not be determined until the next tier of environmental review when facility designs of individual projects became available. The EIR made identical statements regarding proposed transportation improvements associated with the transportation plan.

The EIR summarized several studies linking proximity to heavily traveled roads and freeways to harmful health effects to children. The EIR also noted CARB had estimated the region's health risk from diesel particulate matter in 2000 was 720 excess cancer cases per million and had recommended sensitive land uses not be sited within 500 feet of a freeway, urban roads with 100,000 vehicles per day, and rural roads with 50,000 vehicles per day.

b

Cleveland contends the EIR's air quality impacts analysis violates CEQA because the EIR's description of existing conditions does not adequately depict the public's existing exposure to TACs. Cleveland contends the existing conditions description also fails to identify the approximate number and location of sensitive receptors near planned transportation projects. SANDAG, however, asserts its existing conditions description is sufficiently detailed for a program-level EIR. As these contentions focus on the reasonableness of the EIR's analysis, they present predominately factual questions and our review is for substantial evidence. (*Vineyard*, *supra*, 40 Cal.4th at p. 435; accord, *Smart Rail*, *supra*, 57 Cal.4th at pp. 447-449; *Communities for a Better Environment v. South Coast Air Quality Management Dist.* (2010) 48 Cal.4th 310, 328.)

To fulfill its information disclosure function, "an EIR must delineate environmental conditions prevailing absent the project, defining a baseline against which predicted effects can be described and quantified." (*Smart Rail*, *supra*, 57 Cal.4th at p. 447; see *County of Amador v. El Dorado County Water Agency* (1999) 76 Cal.App.4th 931, 953 [without an adequate baseline description, "analysis of impacts, mitigation measures and project alternatives becomes impossible"]; Guidelines, § 15125, subd. (a).)[14] If the description of the environmental setting " 'is inaccurate, incomplete or

---

[14] Guidelines section 15125, subdivision (a), provides: "An EIR must include a description of the physical environmental conditions in the vicinity of the project, as they exist at the time the notice of preparation is published, or if no notice of preparation is published, at the time environmental analysis is commenced, from both a local and

30

misleading, the EIR does not comply with CEQA. [Citation.] "Without accurate and complete information pertaining to the setting of the project and surrounding uses, it cannot be found that the [EIR] adequately investigated and discussed the environmental impacts of the development project." ' " (*Clover Valley Foundation v. City of Rocklin* (2011) 197 Cal.App.4th 200, 219.)

In this case, for exposures to TACs, the record shows there was available data from monitoring stations and mandatory reports with which SANDAG could have developed a reasoned estimate of the region's existing exposures to TACs. Likewise, for sensitive receptors, the record shows SANDAG has data showing current population and land use patterns and current transportation infrastructure from which it could have developed a reasoned estimate of the number and location of sensitive receptors adjacent to highways and heavily traveled roadways.

The fact more precise information may be available during the next tier of environmental review does not excuse SANDAG from providing what information it reasonably can now. (Guidelines, § 15144.) Moreover, if known impacts are not analyzed and addressed in a program EIR, they may potentially escape analysis in a later tier EIR. (§ 21166; *Citizens Against Airport Pollution v. City of San Jose*, *supra*, 227 Cal.App.4th at pp. 807–808; *Concerned Dublin Citizens v. City of Dublin*, *supra*, 214 Cal.App.4th at p. 1320; *Citizens for Responsible Equitable Environmental Development*

---

regional perspective. This environmental setting will normally constitute the baseline physical conditions by which a lead agency determines whether an impact is significant."

31

*v. City of San Diego*, *supra*, 196 Cal.App.4th at pp. 531-532; *Fort Mojave Indian Tribe v. Department of Health Services*, *supra*, 38 Cal.App.4th at p. 1605.) We, therefore, conclude there is not substantial evidence to support SANDAG's determination it could not reasonably provide additional baseline information in the EIR about TACs exposures and the location of sensitive receptors. The error is prejudicial because it precluded informed public participation and decisionmaking. (§ 21005, subd. (a); *City of Maywood*, *supra*, 208 Cal.App.4th at p. 386.)

c

Both the People and Cleveland contend the EIR's analysis of air quality impacts fails to comply with CEQA because it fails to correlate the transportation plan's adverse air quality impacts to resulting adverse health impacts. SANDAG again contends its disclosure efforts are adequate for the program level of environmental review and producing additional information at this level is infeasible. As with the parties' other contentions, this contention is predominantly factual and our review is for substantial evidence. (*Vineyard*, *supra*, 40 Cal.4th at p. 435.)

"Guidelines section 15126.2, subdivision (a) requires an EIR to discuss, inter alia, 'health and safety problems caused by the physical changes' that the proposed project will precipitate." (*Bakersfield Citizens for Local Control v. City of Bakersfield* (2004) 124 Cal.App.4th 1184, 1219 (*Bakersfield Citizens*).) Accordingly, an EIR must identify and analyze the adverse health impacts likely to result from the project's air quality impacts. (*Id.*, at p. 1220; *Berkeley Keep Jets Over the Bay Com. v. Board of Port Comrs.* (2001) 91 Cal.App.4th 1344, 1367–1371.)

32

Here, the EIR identified in a general manner the adverse health impacts that might result from the transportation plan's air quality impacts. However, the EIR failed to correlate the additional tons of annual transportation-plan-related emissions to anticipated adverse health impacts from the emissions. Although the public and decision makers might infer from the EIR the transportation plan will make air quality and human health worse, at least in some respects for some people, this is not sufficient information to understand the adverse impact. (*Bakersfield Citizens*, *supra*, 124 Cal.App.4th at p. 1220 [EIR analysis of air quality impacts deficient where public would have no idea of the health consequences of increased air pollution].)

While SANDAG contends it is not feasible to provide more definite information at this juncture, we have not located nor has SANDAG identified any evidence in the record supporting this contention. Instead, SANDAG impermissibly relies solely on its own bald assertions of infeasibility contained in the EIR. (*City of Maywood*, *supra*, 208 Cal.App.4th at p. 385 [an EIR must contain facts and analysis, not just the agency's bare conclusions].) Certainly, we recognize there are limitations to the precision of a program-level analysis. SANDAG is nonetheless obliged to disclose what it reasonably can about the correlation; it has not done so, and there is not substantial evidence showing it could not do so. The error is prejudicial because it precluded informed public

participation and decisionmaking.[15] (§ 21005, subd. (a); *City of Maywood*, *supra*, at p. 386.)

d

i

To mitigate the transportation plan's air quality impacts, the EIR identified the following mitigation measures:

1.      Local jurisdictions should incorporate into their land use decisions certain measures recommended by the California Attorney General for reducing greenhouse gas emissions.

2.      At the next tier of environmental review, SANDAG will and other implementing agencies should incorporate certain dust control measures into project specifications for transportation network improvements.

3.      At the next tier of environmental review, SANDAG will and other implementing agencies should require any heavy duty off-road vehicles used to construct transportation network improvements to utilize all feasible measures to reduce specified emissions to a less than significant level.

4.      At the next tier of environmental review, SANDAG will and other implementing agencies should evaluate potential impacts from carbon monoxide, $PM_{10}$

---

[15]     Given this conclusion and its bases, we need not decide the People's conditional motion for judicial notice of examples of correlative information contained in comparable EIRs from other jurisdictions.

and PM$_{2.5}$ emissions, and their health risks and, if required, add one or more recommended mitigation measures to reduce the emissions.

The EIR further concluded these were the only mitigation measures available at the program level of environmental review.

ii

Both the People and Cleveland contend these measures, except for the second, violate CEQA because they improperly defer mitigation of the transportation plan's significant air quality impacts. SANDAG once more counters these measures are adequate for the program level of environmental review.

This issue is at least partially moot given our conclusion in parts II.C.3.b and c, *ante*, as the additional analysis necessary to correct the noted deficiencies will likely require revisions to related sections of the EIR, including the discussion of mitigation measures. (*Communities for a Better Environment v. City of Richmond*, *supra*, 184 Cal.App.4th at p. 91.) However, we briefly address the People's and Cleveland's contentions. As these contentions are predominantly factual, our review is for substantial evidence. (*Vineyard*, *supra*, 40 Cal.4th at p. 435.)

"An EIR shall describe feasible measures which could minimize significant adverse impacts … ." (Guidelines, § 15126.4, subd. (a)(1).) An EIR may not defer the formulation of mitigation measures to a future time, but mitigation measures may specify performance standards which would mitigate the project's significant effects and may be accomplished in more than one specified way. (*Id*., subd. (a)(1)(B).)

35

"Thus, ' " 'for [the] kinds of impacts for which mitigation is known to be feasible, but where practical considerations prohibit devising such measures early in the planning process (e.g., at the general plan amendment or rezone stage), the agency can commit itself to eventually devising measures that will satisfy specific performance criteria articulated at the time of project approval. Where future action to carry a project forward is contingent on devising means to satisfy such criteria, the agency should be able to rely on its commitment as evidence that significant impacts will in fact be mitigated.' " ' [Citation.] Conversely, ' "[i]mpermissible deferral of mitigation measures occurs when an EIR puts off analysis or orders a report without either setting standards or demonstrating how the impact can be mitigated in the manner described in the EIR." ' " (*Preserve Wild Santee v. City of Santee*, *supra*, 210 Cal.App.4th at pp. 280–281.)

In this case, with one exception, the EIR defers the analysis of appropriate mitigation measures. It also fails to set performance standards and commit SANDAG to complying with them. Although SANDAG contends no other mitigation is feasible at the program level of environmental review, we have not located, nor has SANDAG pointed to, any evidence in the record supporting this contention. Accordingly, we conclude there is not substantial evidence to support SANDAG's determination the EIR adequately addressed mitigation for the transportation plan's air quality impacts. The error is prejudicial because it precluded informed public participation and decisionmaking. (§ 21005, subd. (a); *City of Maywood*, *supra*, 208 Cal.App.4th at p. 386.)

### 4

### *Agricultural Impacts*

#### a

The EIR evaluated the transportation plan's agricultural impacts under two significance thresholds.  Under the first threshold, the EIR evaluated the impacts to land designated prime farmland, unique farmland or farmland of statewide significance under California's Natural Resources Agency's farmland mapping and monitoring program.[16] The EIR concluded implementation of the transportation plan would result in the conversion of 3,485.09 acres of such farmland by 2050.

Under the second threshold, the EIR evaluated impacts to all land with existing agricultural uses regardless of classification, lands subject to Williamson Act contracts, and lands designated under the California Farmland Conservancy Program Act.[17]  The

---

[16]　According to the EIR, the farmland mapping and monitoring program is used to identify agricultural resources of 10 acres or more.  "Farmlands are classified according to soil factors, including available water holding capacity, temperature regime, acidity, depth to the water table, electrical conductivity, flooding potential, erosion hazard, permeability, rock content, and rooting depth.  The best quality land is identified as Prime Farmland and Farmland of Statewide Importance."

[17]　According to the EIR, "the Williamson Act [(Gov. Code, § 51200 et seq.)] enables local governments to enter into contracts with private landowners for the purpose of restricting specific parcels of land to agricultural or related open space use.  In return, landowners receive property tax assessments that are much lower than normal because they are based upon farming and open space uses as opposed to full market value."

The California Farmland Conservancy Program Act (§ 10200 et seq.) encourages "the long-term, private stewardship of agricultural lands through the voluntary use of agricultural conservation easements."

EIR concluded implementation of the transportation plan would result in the conversion of 7,023.07 acres of such land by 2050. The conclusion was based on data from the farmland mapping and monitoring program augmented with data from SANDAG's own geographic information system.

b

i

Cleveland contends the EIR violates CEQA by understating the transportation plan's growth-induced impacts on agricultural lands. As this contention is predominantly factual, our review is for substantial evidence. (*Vineyard*, *supra*, 40 Cal.4th at p. 435.)

As we have previously indicated, when reviewing the adequacy of an EIR's disclosures, we are chiefly concerned with whether the EIR reasonably fulfills its function of facilitating informed decisionmaking. An analysis which understates the severity of a project's impacts "impedes meaningful public discussion and skews the decisionmaker's perspective concerning the environmental consequences of the project, the necessity for mitigation measures, and the appropriateness of project approval." (*Citizens to Preserve the Ojai v. County of Ventura* (1985) 176 Cal.App.3d 421, 431.)

In this case, both data sets used to analyze the transportation plan's agricultural impacts have important limitations. The farmland mapping and monitoring program does not capture information for farmland under 10 acres. In addition, according to SANDAG, its own geographic information system's inventory of agricultural land may not include any agricultural lands that went into production after the mid-1990's. The combined effect of these limitations is that there is not substantial evidence to show the

38

EIR's analysis accounted for impacts to farmland of less than 10 acres put into production within the last 20 years. The error necessarily prejudiced informed public participation and decisionmaking because 68 percent of the farmland in the County is between one and nine acres, with the average farm size being four acres. (§ 21005, subd. (a); *City of Maywood*, *supra*, 208 Cal.App.4th at p. 386.)

While SANDAG correctly points out CEQA permits the use of data from the farmland mapping and monitoring program to analyze a project's agricultural impacts (Guidelines, exhibit G), CEQA does not mandate the use of such data nor does it insulate an EIR from further scrutiny if the EIR relies on the data. Moreover, because the transportation plan included the sustainable communities strategy, SANDAG was required by statute to "gather and consider the best practically available scientific information regarding resource areas and farmland in the region … ." (Gov. Code, § 65080, subd. (b)(2)(B)(v).) By choosing a methodology with known data gaps, SANDAG produced unreliable estimates of the amount of existing farmland and, consequently, unreliable estimates of the transportation plan's impacts to existing farmland. Accordingly, SANDAG failed to comply with its statutory obligation as well as CEQA's information disclosure requirements.

ii

Finally, in addition to Cleveland's general contention that the EIR understated the transportation plan's agricultural impacts, Cleveland raises two specific contentions: (1) the EIR failed to disclose and analyze the transportation plan's impacts to small farms, and (2) the EIR's discussion of impacts to agricultural land from growth inaccurately

39

assumed land converted to a rural residential designation would remain farmland. SANDAG counters Cleveland is precluded under section 21177, subdivision (a), from raising these two specific contentions because Cleveland never exhausted its administrative remedies as to them.[18]  Except to the extent the specific contentions are subsumed within the general contention, we agree.

"A CEQA challenge is not preserved 'unless the alleged grounds for noncompliance with [CEQA] were presented to the public agency orally or in writing by any person during the public comment period provided by this division or prior to the close of the public hearing … .'  [Citation.]  'Exhaustion of administrative remedies is a jurisdictional prerequisite to maintenance of a CEQA action.'  [Citation.]

" 'To advance the exhaustion doctrine's purpose "[t]he 'exact issue' must have been presented to the administrative agency … ."  [Citation.]  While " 'less specificity is required to preserve an issue for appeal in an administrative proceeding than in a judicial proceeding … because, … parties in such proceedings generally are not represented by counsel … ' [citation]" [citation], "generalized environmental comments at public hearings," "relatively … bland and general references to environmental matters" [citation], or "isolated and unelaborated comment[s]" [citation] will not suffice.  The same is true for " '[g]eneral objections to project approval … .'  [Citations.]"  [Citation.]

---

[18]     Section 21177, subdivision (a), provides:  "An action or proceeding shall not be brought pursuant to Section 21167 unless the alleged grounds for noncompliance with this division were presented to the public agency orally or in writing by any person during the public comment period provided by this division or prior to the close of the public hearing on the project before the issuance of the notice of determination."

" '[T]he objections must be sufficiently specific so that the agency has the opportunity to evaluate and respond to them.' " ' [Citation.]

" ' "The petitioner bears the burden of demonstrating that the issues raised in the judicial proceeding were first raised at the administrative level. [Citation.]" [Citation.] An appellate court employs a de novo standard of review when determining whether the exhaustion of administrative remedies doctrine applies.' " (*Citizens for Responsible Equitable Environmental Development v. City of San Diego*, *supra*, 196 Cal.App.4th at p. 527.)

Cleveland has not met its burden in this case. Before SANDAG approved the EIR, Cleveland submitted a letter commenting on the EIR's analysis of agricultural impacts from growth as follows: "[T]he [EIR] states that approximately 10,500[19] acres of agricultural land will be impacted due to regional growth and land use change by the year 2050. [Citations.] The [EIR] also acknowledges that its regional growth projections are based on current planning assumptions for San Diego County and the jurisdictions therein. [Citation.] However, the EIR for the County's current General Plan update, which by definition reflects current planning assumptions (as of 2011), shows that the General Plan expects *55,963* acres of agricultural land to convert to non-agricultural uses by the year 2030. [Citation.] Even though they account for conditions expected to exist

---

19      This figure apparently represents the combined total of the impacts identified under both significance thresholds (see pt. II.C.4.a, *ante*).

20 years sooner, these impacts are more than five times greater than the impacts identified in the [transportation plan's EIR].

"It is not clear how the [EIR] could use current planning assumptions for growth and determine that there will be only 10,500 acres of agricultural land impacted, when the current plans on which it bases its assumptions assume there will be more than five times as many acres impacted. SANDAG must explain if there is a basis for this discrepancy. Without any such explanation, the [EIR] appears to severely underestimate the amount of agricultural land that will be impacted, in contravention of CEQA. [¶] In sum, the [EIR's] failure to accurately account for impacts to agricultural land renders it inadequate as a matter of law."

Even read liberally, Cleveland's comment letter did not fairly apprise SANDAG that Cleveland had specific concerns about the EIR's handling of impacts to small farms and lands redesignated rural residential. Instead, Cleveland's comment letter focused on the discrepancy between SANDAG's estimate of overall growth-induced impacts and the County's estimate of overall growth-induced impacts. Cleveland cites to no other place in the record where any other person or organization raised specific concerns about the EIR's handling of impacts to small farms and lands designated rural residential. Consequently, Cleveland has not demonstrated exhaustion of administrative remedies as to these concerns.

III

DISPOSITION

The judgment is reversed to the extent the superior court determined the EIR failed to adequately analyze the transportation plan's greenhouse gas emissions impacts. The judgment is affirmed to the extent the superior court determined the EIR failed to adequately address the mitigation measures for the transportation plan's greenhouse gas emissions impacts. The judgment is modified to incorporate this court's decision on the cross-appeals. The matter is remanded to the superior court with directions to enter a modified judgment and order the issuance of a peremptory writ of mandate conforming to the Supreme Court's decision in *Cleveland II* and to this court's decision on remand. The People and Cleveland are awarded their appeal and cross-appeal costs.


McCONNELL, P. J.

I CONCUR:


IRION, J.

BENKE, J., Dissenting.

Our Supreme Court in *Cleveland National Forest Foundation v. San Diego Association of Governments* (2017) 3 Cal.5th 497, 504 (*Cleveland II*), held that defendant San Diego Association of Governments (SANDAG) did not abuse its discretion by refusing in a 2011 environmental impact report (EIR), which accompanied its 2050 Regional Transportation Plan and Sustainable Communities Strategy (Plan), to engage in an analysis of consistency of projected 2050 regional greenhouse gas (GHG) emission impacts with the state-wide reduction goals set forth in a 2005 Executive Order issued by then Governor Schwarzenegger.  In reaching its decision, the Supreme Court noted that the majority's November 24, 2014 opinion, as modified on December 16, 2014 (*Cleveland National Forest Foundation et al. v. San Diego Association of Governments et al.* (D063288) [nonpub opn.] (*Cleveland I*)), identified additional alleged deficiencies in the 2011 EIR other than the consistency analysis of GHG emission impacts out to 2050.  (*Cleveland II*, *supra*, at p. 519.)  With respect to these alleged additional deficiencies, the Supreme Court "express[ed] no view on how, if at all, [its] opinion affect[ed] their disposition."  (*Ibid.*)

Following remand, Cleveland National Forest Foundation, Sierra Club, Center for Biological Diversity, Creed-21, and Affordable Housing Coalition of San Diego County (plaintiffs), along with intervenor State of California (State), moved this court to reissue *Cleveland I* as modified by the Supreme Court in *Cleveland II*.  Plaintiffs and State contended *Cleveland I* as modified allegedly continues to provide "important guidance on

issues that are very likely to recur and that are of continuing public interest throughout the state."

SANDAG opposed this request, arguing *Cleveland I* was moot. In support of this argument, SANDAG noted that the 2011 EIR had been superseded by a 2015 EIR that accompanied SANDAG's 2015 Plan, as was recognized by the Supreme Court in *Cleveland II* (*Cleveland II*, *supra*, 3 Cal.5th at pp. 510–511); that in preparing the 2015 EIR, SANDAG had considered *Cleveland I*; that the 2015 EIR included updated information and analysis, as was also recognized by the Supreme Court in *Cleveland II* (*id.* at p. 518); and perhaps most importantly, that neither plaintiffs nor State challenged the 2015 EIR.

The majority agrees with plaintiffs and State and thus has reissued *Cleveland I* as modified by *Cleveland II*. (For ease of reference, I will refer to modified *Cleveland I* as "*Cleveland III*.") In explaining why *Cleveland III* allegedly is not moot, the majority notes that "there is no evidence [in the record] indicating the [2011] EIR . . . has been decertified and can no longer be relied upon for the current version or future versions of the [2050] transportation plan," and also that "there is no evidence indicating these environmental review documents [associated with the 2015 Plan and EIR] addressed this court's concerns about any of the [2011] EIR's other analytical deficiencies."

Thus, the majority concludes *Cleveland III* "*may* still be able to provide [plaintiffs] and [State] with effective relief because correcting the defects in the [2011] EIR *may* result in modifications to the current version or future versions of the [2050] transportation plan." (Italics added.) In reaching this conclusion, the majority notes that

2

SANDAG will have an "opportunity to demonstrate whether and how it may have already addressed the [2011] EIR's identified deficiencies when it submits its return to the peremptory writ of mandate."

I oppose reissuing *Cleveland I* as modified (i.e., *Cleveland III*) because I conclude the superseded 2011 EIR is *most likely* moot as a result of the certification of the 2015 EIR accompanying the 2015 Plan.[1] I say "most likely" because the determination of whether the case is moot (or partially moot) should be made by the trial court on remand and *not* by this court.

The majority's reasoning in support of issuing *Cleveland III* actually supports remand of the mootness issue to the trial court. As noted, the majority reasoned there is "no evidence" that the 2011 EIR "can no longer be relied upon for the current version or future versions of the [2050] transportation plan." While this *may* be true (even though the 2011 EIR relies on stale facts and law that are no longer current), by the same

---

1 " ' "[A]lthough a case may originally present an existing controversy, if before decision it has, through act of the parties or other cause, occurring after the commencement of the action, lost that essential character, it becomes a moot case or question which will not be considered by the court." ' [Citations.]" (*Consumer Cause, Inc. v. Johnson & Johnson* (2005) 132 Cal.App.4th 1175, 1183.) However, as the Supreme Court in *Cleveland II* recognized, a moot question need not be dismissed if it "presents an important *question of law* that is likely to recur yet evade review. . . ." (*Cleveland II*, *supra*, 3 Cal.5th at p. 511, italics added.) Conversely, courts of review also recognize that they should refrain from exercising their inherent discretion to revolve moot issues on appeal that are largely factual. (See e.g., *Giles v. Horn* (2002) 100 Cal.App.4th 206, 228 ["Because plaintiffs' claim is a particularly factual determination that must be resolved on a case-by-case basis, dependent upon the specific facts of a given situation, it is not one on which we would exercise our discretion to address on the merits, despite the fact that it is moot"].) Here, it appears *none* of the remaining issues addressed by the majority in *Cleveland III* involve questions of law, much less "important" ones. (See *Cleveland II,* at p. 511.)

reasoning the opposite also *may* be true. As a court of review, we do not know whether one or more of the remaining issues in the 2011 EIR is moot because our record is insufficient to make that determination.

I, for one, am unwilling to speculate on whether plaintiffs and State may or may not be afforded "effective relief" by issuing *Cleveland III*, particularly when these remaining issues are predominately factual as the majority correctly notes. (See Maj. Opn., p. 19 [whether the 2011 EIR adequately addressed mitigation for the 2011 Plan's GHG emissions]; p. 24 [whether the 2011 EIR's analysis of project alternatives was reasonable]; and pp. 22, 30 [whether the 2011 EIR's analysis of air quality impacts was reasonable].) Of course, we can eliminate the guesswork and alleviate the confusion *Cleveland III* may potentially create, including on the issue of which party or parties, if any, prevailed in the litigation, simply by sending the case back to the trial court.[2] On remand, the court then can receive additional evidence and briefing on the mootness issue and resolve the case accordingly.

BENKE, J.

---

[2] It is axiomatic that the question of whether a party is a prevailing party is best left to the trial courts. (*Nestande v. Watson* (2003) 111 Cal.App.4th 232, 238 [whether a party has met the statutory requirements for an award of attorney fees is a question best decided by the trial court in the first instance]; *Schmier v. Supreme Court* (2002) 96 Cal.App.4th 873, 877–878 [whether one is a prevailing party for purposes of Code of Civ. Proc., § 1021.5 is a factual pragmatic inquiry generally left to the trial court].) This is yet another reason for the case to be remanded, as I disagree with *Cleveland III*'s award of costs to plaintiffs and State because SANDAG prevailed on what I *and* the trial court in its November 30, 2012 order considered to be the overarching issue in this case that was decided by the Supreme Court in *Cleveland II.*