Filed 6/26/25 (unmodified opn. attached)

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Placer)

----

| | |
|---|---|
| SACRAMENTO TELEVISION STATIONS INC., | C102316 |
| Petitioner, | |
| | (Super. Ct. No. SCV0052277) |
| v. | |
| | ORDER MODIFYING |
| THE SUPERIOR COURT OF PLACER COUNTY, | OPINION AND DENYING REHEARING |
| Respondent; | |
| | [NO CHANGE IN JUDGMENT] |
| CITY OF ROSEVILLE, | |
| Real Party in Interest. | |

ORIGINAL PROCEEDING in mandate. Petition granted with directions. Glenn MacNeur Holly, Judge.

Jassy Vick Carolan, Jean-Paul Jassy and Jordyn Ostroff for Petitioner.

1

John David Loy for the First Amendment Coalition, Californians Aware, Electronic Frontier Foundation, Los Angeles Times Communications LLC, The McClatchy Company, LLC, and Reporters Committee for Freedom of the Press as Amici Curiae on behalf of Petitioner.

No appearance for Respondent.

Best Best & Krieger, Christopher M. Pisano and Gregg W. Kettles for Real Party in Interest.

Donald A. Larkin for League of California Cities and the California State Association of Counties as Amici Curiae on behalf of Real Party in Interest.

THE COURT:

It is ordered that the opinion filed herein on June 6, 2025, be modified as follows:

1. At the end of the first paragraph on page 20, after the string cite and sentence ending "every word, phrase, and sentence," add as footnote 19 the following footnote, which will require renumbering of all subsequent footnotes:

> [19]In a petition for rehearing, Sac TV contends that this opinion (1) "creates an irreconcilable conflict" with a 2011 decision of the First Appellate District, which emphasized that in camera review is " 'generally disfavored' " and should be a "last resort"; (2) "jeopardizes" a CPRA requester's due process rights; (3) "undermines the right to timely access and prompt disclosure"; and (4) "undercuts the Legislature's intent in adopting [s]ection 7923.625 in the first place." These contentions disagree with this opinion's analysis, including the observation that Sac TV's proposed construction of section 7923.625 "may ultimately prove to be right in this case," but is not "the best articulation of a legal rule flexible enough to reflect the relevant legislative intent." This opinion further observes that crafting a bright-line rule defining the contours of an "incident involving the discharge of a firearm" (§ 7923.625, subd. (e)) may

be an impossible task.  Accordingly, Sac TV's contentions do not demonstrate that this opinion contains mistakes of law.

This modification does not change the judgment.  The petition for rehearing is denied.

FOR THE COURT:


     /s/
BOULWARE EURIE, Acting P.J.


     /s/
MESIWALA J.


     /s/
WISEMAN, J.*

---

* Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

CERTIFIED FOR PUBLICATION


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Placer)

----


| SACRAMENTO TELEVISION STATIONS INC., | C102316 |
| Petitioner, | (Super. Ct. No. SCV0052277) |
| v. | |
| THE SUPERIOR COURT OF PLACER COUNTY, | |
| Respondent; | |
| CITY OF ROSEVILLE, | |
| Real Party in Interest. | |


ORIGINAL PROCEEDING in mandate. Petition granted with directions. Glenn M. Holley, Judge.

Jassy Vick Carolan, Jean-Paul Jassy and Jordyn Ostroff for Petitioner.

John David Loy for the First Amendment Coalition, Californians Aware, Electronic Frontier Foundation, Los Angeles Times Communications LLC, The McClatchy Company, LLC, and Reporters Committee for Freedom of the Press as Amici Curiae on behalf of Petitioner.

No appearance for Respondent.

1

Best Best & Krieger, Christopher M. Pisano and Gregg W. Kettles for Real Party in Interest.

Donald A. Larkin for League of California Cities and the California State Association of Counties as Amici Curiae on behalf of Real Party in Interest.

In this writ proceeding under the California Public Records Act (CPRA; Gov. Code, § 7920.000 et seq.),[1] we consider whether real party in interest, the City of Roseville (City), must disclose to petitioner, Sacramento Television Stations Inc. doing business as CBS News Sacramento (Sac TV), additional audio and video recordings that depict an "incident involving the discharge of a firearm at a person by a peace officer" (§ 7923.625, subd. (e)(1)).

Respondent superior court concluded that body camera recordings capturing the moments before and after Roseville Police Department (Roseville PD) officers fired at a suspect provided insufficient context to satisfy subdivision (e). However, it declined to determine how much additional disclosure was required, finding that an exemption applied: further release of requested recordings would substantially interfere with an active investigation. (See § 7923.625, subd. (a)(2).) Accordingly, the superior court denied Sac TV's mandate petition seeking an order compelling the City to disclose more recordings.

Sac TV then filed a petition for writ of mandate in this court, seeking review of the superior court's ruling. After considering the arguments presented—including those of amici curiae—the text and legislative history of the bill that enacted the language now found in section 7923.625,[2] and other applicable authorities, we conclude: (1) the

---

[1] Undesignated statutory references are to the Government Code. All undesignated subdivision references are to section 7923.625 of the Government Code.

[2] CPRA was previously codified as section 6250 et seq. and was recently recodified and reorganized. (Stats. 2021, ch. 614, §§ 1, 2.)

2

superior court correctly determined that subdivision (e) required more disclosure than the City provided; (2) the superior court's "active investigation" finding under subdivision (a) was not supported by substantial evidence; and therefore, (3) the superior court must determine the extent of additional disclosure required after conducting further proceedings, including an in camera review of the City's recordings (see § 7923.105). Accordingly, we will vacate the superior court's ruling and direct it to hold further proceedings.

BACKGROUND

I

*Gunshots, Records Requests, and the Party's Initial Filings*

Around 12:30 p.m. on April 6, 2023, gunshots were fired in a City park after officers of the California Highway Patrol (CHP) attempted to serve a search warrant on Eric J. Abril. When Roseville PD responded to the park, they understood that a CHP officer had been shot and that Abril had a gun and was holding two civilian hostages. Multiple Roseville PD officers fired shots, and a wounded Abril was captured at approximately 1:13 p.m. Both hostages sustained gunshot wounds, one of them fatally.

In response to a Sac TV reporter's inquiry about the release of police body camera and dashboard camera footage of the April 6 occurrence, a Roseville PD lieutenant wrote in a June 2023 e-mail that officers "exchanged gunfire with . . . Abril between approximately 12:38 p.m. and 12:57 p.m.,"[3] and "[w]hile a much larger criminal *event* occurred, the *incident* involving the discharge of a firearm at a person is the only 'critical incident' involving" Roseville PD. (Italics added.) The lieutenant's e-mail included a link to "portions of the audio/video records related to the involved officers," specifically: (a) four 39-second clips of body camera footage (with audio and video) from four

---

[3] The City contends the "entire incident involving the discharge of firearms by Roseville PD took place within a three (3) minute window" of time.

different Roseville PD officers, and (b) two audio clips of radio communications—one nearly three minutes long and the other 27 seconds long.

Later, a second Sac TV reporter insisted that Roseville PD was required to release additional footage, writing in an e-mail: "We are requesting the full footage from all" body cameras "and dash cameras at the scene of the . . . incident on April 6th—beginning with" officers' "arrival at [the] [p]ark . . . through the time the suspect was apprehended and taken into custody (removed from the park)." Referencing the text of Assembly Bill No. 748, the reporter argued, "[t]he term 'relates to' imposes a broad obligation of disclosure." In response, the lieutenant maintained that Roseville PD had released everything it was legally required to disclose, and asserted that the reporter's e-mail "conflate[d] the overall criminal event with the narrow 'critical incident.' " The statutory language "is very clear," the lieutenant wrote: it "expressly says 'relates to' means that it 'depicts' a 'critical incident.' "

Later communications between the parties and their attorneys did not resolve the dispute. In fact, the dispute deepened in October 2023 when a Sac TV reporter requested Roseville PD drone footage of the April 6 occurrence and Roseville PD's response was that it had not changed its position on what it was required to release. In February 2024, Sac TV filed a petition for writ of mandate in the superior court seeking an order directing the City to "immediately disclose . . . the requested materials."[4] Sac TV maintained that Assembly Bill No. 748 required Roseville PD to release "recordings from the moment that Roseville PD was dispatched after hearing 'shots fired,' to the time that law enforcement apprehended the armed suspect and secured the scene, approximately one hour later." The City took the position that it had released all the recordings required

---

[4] In that petition, Sac TV asserted that CHP had disclosed seven hours of recordings from the April 6 occurrence. Citing insufficient knowledge on the matter, the City neither admitted nor denied this assertion in its answer to the petition.

by Assembly Bill No. 748, because within the larger criminal event of April 6, 2023, there were "several smaller incidents, including . . . two separate 'critical incidents[,]' and a hostage rescue." The City asserted the phrase "incident involving" in Assembly Bill No. 748 "is meant to acknowledge the realities of police officer-involved shootings, and the fact that there is a sphere of events . . . that surround the . . . decision to discharge a firearm. This sphere naturally includes the time leading up [to] the decision to discharge a firearm, the actual discharge of the firearm, and then the cessation of the discharge."

The City also argued that even if Sac TV's interpretation of Assembly Bill No. 748 were correct, it could rightfully delay releasing additional footage under a statutory exception, as disclosure would "substantially interfere" with "an active criminal investigation and criminal court case pending"—Abril's criminal trial.

II

*July 2024 Hearing*

In a July 2024 hearing, a City attorney indicated that the four 39-second clips of body camera footage the City released to Sac TV constituted the total time period in which Roseville PD officers fired six shots when they responded to the park on April 6: "four in rapid succession from one officer, and then two lone shots from two other officers." As for the drone footage that the City had not released to Sac TV, the City attorney argued that footage did not "depict[] any discharge of firearms by any officers, Roseville [PD] or otherwise"; rather, it depicted Abril "committing heinous acts." Further, the attorney noted, a judge had ordered the drone footage sealed in connection with Abril's criminal case.

Another topic of discussion at the hearing was the question of in camera review of the City's recordings. The City attorney declared he was prepared that day to show recordings to the superior court in camera. The superior court queried whether it had a mandatory duty to conduct an in camera review. In reply, the City attorney noted that section 7923.105 states "the Court shall examine in camera, but it is contemplating . . . a

5

scenario where . . . we're fighting over a document and we think we don't have to produce it, . . . not necessarily a situation where the Court is being asked to review hours of body cam footage to determine . . . whether a limited set is exempt from disclosure."[5]

### III

### *Supplemental Briefing*

In supplemental briefing, the City argued the trial court's order sealing certain exhibits presented at Abril's preliminary hearing and a prosecutor's declaration made in support of that order (a) barred Sac TV's requested relief under CPRA and (b) demonstrated why the release of more footage would substantially interfere with an ongoing investigation. The criminal court's July 2024 sealing order provides: "[T]he exhibits marked and presented during the course of the preliminary hearing in [Abril's criminal case] be sealed and kept under seal and in the custody of the Court and not be made part of the public record until further order of this court." One of the trial court's express findings forming the basis of this order was that there was a sufficient showing that the "on-going investigation" would be prejudiced in the absence of the sealing order. The supporting declaration of the prosecuting attorney in Abril's criminal case stated the People were concerned that release to the public of images presented at Abril's preliminary hearing "would create traumatic publicity for the victims and would greatly impair [Abril's] ability to receive a fair jury trial."[6]

The City also argued that the superior court would have to conduct an in camera review if it concluded that Sac TV was entitled to more footage. Sac TV argued the

---

[5] Section 7923.105 provides: "The court shall decide the case after the court does all of the following: [¶] (a) Examine the record in camera, if permitted by subdivision (b) of Section 915 of the Evidence Code," "(b) Examine any papers filed by the parties," and "(c) Consider any oral argument and additional evidence as the court may allow."

[6] Abril's counsel joined the prosecution's request to seal exhibits presented at the preliminary hearing.

6

sealing order had limited effect, if any, on its mandate petition, because the list of exhibits presented at Abril's preliminary hearing did not include any of the body camera or dashboard camera footage at issue.[7]  As for Assembly Bill No. 748's exception for an ongoing investigation, Sac TV argued the City had forfeited this argument by failing to raise it earlier, and on the merits the City's showing fell short because, among other reasons, Abril's prosecutor's "concern" about victim trauma and Abril's right to a fair trial did not amount to clear and convincing evidence that there would be substantial interference with an investigation.  Lastly, Sac TV insisted no in camera review was necessary because the City had to release all recordings of the period of time bordered by two bright lines "from the time [Roseville PD] was dispatched to the scene at approximately 12:30 p.m., to the time the scene was secured about an hour later."

IV

*Ruling and Filings in This Court*

In an October 2024 ruling, the superior court denied Sac TV's mandate petition, finding that under subdivision (a)(2), the City had shown by clear and convincing evidence that further disclosure of recordings would substantially interfere with the active investigation in Abril's criminal case.[8]  Although the superior court acknowledged that subdivision (e)'s broad language required a recording of a shooting to include *more* than just the seconds before and after, the City's showing of an active investigation rendered it unnecessary to determine precisely how much additional disclosure would have been required in this dispute.

---

[7]  Regarding drone footage, Sac TV argued the sealing order did not prohibit disclosure because it was "not an injunction on release pursuant to . . . CPRA."

[8]  The superior court rejected Sac TV's contention that the City had forfeited the issue, noting that Sac TV cited no authority to support its claim and that the court was unaware of any authority requiring such a finding.

In October 2024, Sac TV filed a timely petition for writ of mandate in this court, seeking review and reversal of the superior court's ruling and an order compelling disclosure of all audio and video footage in the City's and Roseville PD's possession "from April 6, 2023 from the time [Roseville PD] officers arrived on the scene" at the City park around 12:30 p.m. "to the time the scene was secured by law enforcement with [Abril] in custody at about 1:25 p.m. the same day." We issued an order to show cause. This matter was fully briefed in February 2025, and oral argument was held on May 20, 2025.[9]

DISCUSSION

I

*Legal Background*

A. *CPRA*

"Enacted in 1968, CPRA declares that 'access to information concerning the conduct of the people's business is a fundamental and necessary right of every person in this state.' " (*City of San Jose v. Superior Court* (2017) 2 Cal.5th 608, 615 (*City of San Jose*).) In 2004, the voters enshrined this principle in the California Constitution. (*Ibid.*; Cal. Const., art. I, § 3, subd. (b)(1).) Government openness and accountability are essential to our democracy. (*City of San Jose*, at p. 615.) Thus, public access laws serve a crucial function because they facilitate government openness and accountability by shining a light on the exercise of official power. (*Ibid.*)

CPRA generally requires disclosure of public records upon request and establishes a presumptive right of access to any record created or maintained by a public agency that

---

[9] In addition to the City's return and Sac TV's reply, amicus briefs were filed in support of each party. First Amendment Coalition, on behalf of itself and other organizations, filed an amicus brief supporting Sac TV. League of California Cities and the California State Association of Counties jointly filed an amicus brief supporting the City. The City subsequently filed an answer to First Amendment Coalition's amici brief.

relates to the agency's business, unless a statutory exception applies. (*City of San Jose*, *supra*, 2 Cal.5th at p. 616.)

However, "public access to information must sometimes yield to personal privacy interests. When enacting CPRA, the Legislature was mindful of the right to privacy [citation], and set out multiple exemptions designed to protect that right. [Citations.] Similarly, while the Constitution provides for public access, it does not supersede or modify existing privacy rights. (Cal. Const., art. I, § 3, subd. (b)(3).)" (*City of San Jose*, *supra*, 2 Cal.5th at pp. 615-616.)

B.     *Statutory Interpretation*

When interpreting a statute, our task is to determine the Legislature's intent in order to effectuate the law's purpose. We first examine the statutory language, and give it a plain and commonsense meaning. We examine that language within the context of the entire statutory scheme to harmonize the various parts of a legislative enactment and give significance to every word, phrase, and sentence. If the language is clear, courts should follow its plain meaning unless that would result in an absurd result the Legislature did not intend. If the statutory language permits more than one reasonable interpretation, courts may consider the statute's purpose, legislative history, and public policy. (*City of San Jose*, *supra*, 2 Cal.5th at pp. 616-617.)

In CPRA matters, "this standard approach to statutory interpretation is augmented by a constitutional imperative. [Citation.] Proposition 59 amended the Constitution to provide, 'A statute, court rule, or other authority, including those in effect on the effective date of this subdivision, shall be *broadly* construed if it furthers the people's right of access, and *narrowly* construed if it limits the right of access.' (Cal. Const., art. I, § 3, subd. (b)(2), italics added.)  ' "Given the strong public policy of the people's right to information concerning the people's business [citation], and the constitutional mandate to construe statutes limiting the right of access narrowly (Cal. Const., art. I, § 3, subd.

9

(b)(2)), 'all public records are subject to disclosure unless the Legislature has *expressly* provided to the contrary.' " ' " (*City of San Jose*, *supra*, 2 Cal.5th at p. 617.)

C.      *Assembly Bill No. 748*[10]

In 2018, after multiple failed attempts in the preceding years to enact legislation regarding law enforcement body camera recordings, the Legislature passed and the Governor signed into law Assembly Bill No. 748 (2017-2018 Reg. Sess.) (Assembly Bill No. 748).  (See Sen. Rules Com., Off. of Sen. Floor Analysis, 3d reading analysis of Assem. Bill No. 748 (2017-2018 Reg. Sess.) as amended Aug. 23, 2018, pp. 7-8; Assem. Com. on Privacy and Consumer Protection, Analysis of Assem. Bill No. 748 (2017-2018 Reg. Sess.) as amended Aug. 23, 2018, pp. 4-5.)  Before Assembly Bill No. 748, public agencies generally could decline to release body camera footage by invoking a CPRA exemption for law enforcement investigatory records.  (See former § 6254, subd. (f); *Castañares v. Superior Court* (2023) 98 Cal.App.5th 295, 305-306 & fn. 7 [video footage that is part of an investigatory file exempt from disclosure]; *Becerra v. Superior Court* (2020) 44 Cal.App.5th 897, 914 (*Becerra*) ["law enforcement investigatory files were, until recently, categorically exempted from the CPRA's general requirement of disclosure"]; Sen. Com. on Judiciary, Analysis of Assem. Bill No. 748 (2017-2018 Reg. Sess.) as amended June 14, 2018, p. 9 ["This bill would require the disclosure of certain audio or visual records that a law enforcement agency would otherwise be able to withhold under the investigatory exemption"].)

Assembly Bill No. 748 limited the scope of this "investigatory exemption" by "provid[ing] specific guidelines to govern the disclosure . . . of certain . . . recordings

---

[10]  On our own motion, we take judicial notice of Assembly Bill No. 748's legislative history.  (Evid. Code, §§ 452, subd. (c), 459.)  Accordingly, the City's motion for judicial notice of two legislative committee analyses of Assembly Bill No. 748 is denied as moot.

held by law enforcement." (Assem. Com. on Privacy and Consumer Protection, Analysis of Assem. Bill No. 748, *supra*, p. 5.)[11]

      1.    *Text*

Assembly Bill No. 748 added what is now section 7923.625 of CPRA, which provides in relevant part: "Notwithstanding any other provision of this article . . . a video or audio recording that *relates to a critical incident, as defined in subdivision (e)*, may be withheld only as follows": during an "*active criminal or administrative investigation*," disclosure may be delayed for no longer than 45 days if disclosure would "substantially interfere with the investigation, such as by endangering the safety of a witness or a confidential source" (§ 7923.625, subd. (a)(1), italics added); after 45 days and up to one year, an agency may continue to delay disclosure of a recording "if the agency demonstrates that disclosure would substantially interfere with the investigation," and beyond one year the agency may continue to delay disclosure "only if the agency demonstrates *by clear and convincing evidence* that disclosure would *substantially interfere* with the investigation" (§ 7923.625, subd. (a)(2), italics added).

Subdivision (e) defines the phrase "relates to a critical incident" and provides: "For purposes of this section, a video or audio recording relates to a critical incident if it depicts any of the following incidents: [¶] (1) An incident involving the discharge of a

---

[11] During the legislative session in which Assembly Bill No. 748 was passed, the Legislature also passed and the Governor signed Senate Bill No. 1421 (2017-2018 Reg. Sess.) (Senate Bill No. 1421), which changed the law to provide that state and local agency records must be made available for public inspection pursuant to CPRA if they relate to the report, investigation, or findings of, inter alia, an incident in which an officer discharged a firearm at a person. (*Becerra*, *supra*, 44 Cal.App.5th at pp. 915-916; see Pen. Code, § 832.7, subd. (b)(1)(A)(i).) Neither the record nor the parties' briefing indicate the existence of such a report, investigation, or findings in connection with the April 6 occurrence. (Cf. § 12525.3, subd. (b) [mandatory for a "state prosecutor" to investigate "incidents of an officer-involved shooting resulting in the death of an unarmed civilian"]; see Stats. 2020, ch. 326, § 1.)

firearm at a person by a peace officer or custodial officer." (§ 7923.625, subd. (e)(1).)[12] Subdivision (b) articulates a balancing of the reasonable expectation of privacy of a person depicted in a recording with the public interest in disclosure of the recording. It provides, in relevant part, that if an agency demonstrates that the public interest in withholding a recording clearly outweighs the public interest in disclosure "because the release of the recording would, based on the facts and circumstances depicted in the recording, violate the reasonable expectation of privacy of a subject depicted in the recording," the agency "may use redaction technology, including blurring or distorting images or audio, to obscure those specific portions of the recording that protect that interest." But "the redaction shall not interfere with the viewer's ability to fully, completely, and accurately comprehend the events captured in the recording." (§ 7923.625, subd. (b)(1).) And if the agency demonstrates that the reasonable expectation of privacy of "a subject depicted in the recording cannot adequately be protected through redaction . . . and that interest outweighs the public interest in disclosure, the agency may withhold the recording from the public." (§ 7923.625, subd. (b)(2).)

      2.    *Legislative History*

The legislative history does not illuminate the Legislature's intended precise meaning of the words "incident" and "involving" in the phrase "incident involving the discharge of a firearm" in subdivision (e). However, it does illuminate the Legislature's intent and purpose in other regards.

Concerning subdivision (b)'s balancing of privacy interests with disclosure interests, an Assembly committee analysis suggested a recording could be fully withheld

---

[12] A recording also "relates to a critical incident" if it depicts an "incident in which the use of force by a peace officer or custodial officer against a person resulted in death or in great bodily injury. (§ 7923.625, subd. (e)(2).)

from the public only if "redaction would not protect the subject of the video." (Assem. Com. on Privacy and Consumer Protection, Analysis of Assem. Bill No. 748, *supra*, p. 6; *ibid.* [if "a subject's privacy would be violated by release of the video, the bill would *require* redaction of the subject, if possible, prior to releasing the footage," but if redaction "would not protect the subject of the video, this bill would allow the agency to withhold the video from the public" (italics added)].)

Concerning the type of "investigation" contemplated by subdivision (a), substantial interference with which will permit an agency to delay disclosure of a recording, the analysis noted that a statewide law enforcement association wrote in opposition to the legislation, the " 'requirements set forth in this measure fail to adequately protect ongoing investigations or active prosecutions and place incredible burdens on individual departments.' " (Assem. Com. on Privacy and Consumer Protection, Analysis of Assem. Bill No. 748, *supra*, p. 7.) In response, and silent on the notion of an "active prosecution," the analysis observed the legislation "appears to reasonably protect the investigatory exemption that law enforcement currently utilizes by giving police the ability to withhold footage . . . if . . . that disclosure . . . would substantially interfere with an active investigation." (*Ibid*.)

Comments from a bill's author, incorporated into the legislative analysis, may be helpful in determining legislative intent. (See *In re Jennings* (2004) 34 Cal.4th 254, 264 [considering an author's comments incorporated in subsequent bill analysis].) Here, the Assembly Floor Analysis of Assembly Bill No. 748 (the final analysis of the bill) provides: "According to the author, 'Transparency between law enforcement and the communities they protect is critical to establishing and maintaining good relationships. For those law enforcement agencies that have chosen to deploy body cameras on their officers, this bill simply requires these agencies to adopt and post a policy on how the public may seek access to the body camera recordings. Too often, confusion about public access to these recordings exacerbates sensitive or controversial situations.' " (Assem.

13

Floor Analysis, Conc. in Sen. Amends. to Assem. Bill No. 748 (2017-2018 Reg. Sess.) as amended Aug. 23, 2018, p. 5.) These comments, memorialized in the August 2018 floor analysis, are only minimally helpful in determining the legislative intent behind Assembly Bill No. 748, as they were made when the February 2017 original version of the bill had a narrower scope. (See Assem. Com. on Public Safety, Analysis of Assem. Bill No. 748 (2017-2018 Reg. Sess.) as introduced February 15, 2017, pp. 1-3.) As signed into law, Assembly Bill No. 748 clearly does more than simply require agencies that use body cameras to post a policy on public access to the recordings.

## II

### *Analysis*

A. *Standard of Review*

We review for substantial evidence the superior court's factual findings and we review independently its determinations on questions of statutory interpretation and law. (*Labor & Workforce Development Agency v. Superior Court* (2018) 19 Cal.App.5th 12, 25.)

B. "*Active Investigation*" *Exemption*

Sac TV contends the superior court erred in finding that the City demonstrated by clear and convincing evidence that further disclosure of requested recordings would substantially interfere with "the ongoing, active investigation in" Abril's criminal case because (1) the City forfeited the issue by failing to raise it in a timely manner,[13] and on the merits because (2) a pending criminal prosecution is not an "active investigation"

---

[13] Sac TV contends the City "waived" the issue. But our Supreme Court recently emphasized that the principle at issue here is properly understood as "forfeiture." (See *North American Title Co. v. Superior Court* (2024) 17 Cal.5th 155, 178 [explaining that if a party does not raise an argument in the required manner, that failure "constitutes a forfeiture, not a waiver," and "encourag[ing] courts and litigants to use precise terminology"].) Accordingly, we will discuss this issue as forfeiture, not waiver.

within the meaning of subdivision (a) and (3) the City presented no evidence explaining how, even if a pending prosecution is an active investigation under Assembly Bill No. 748, disclosure would have substantially interfered with it.

We conclude the record does not disclose substantial evidence for the trial court's finding that the "active investigation" exemption applies here.[14] The few facts presented to the superior court lacked meaningful detail.[15] As a definitional matter, we agree with the thrust of Sac TV's position that a pending criminal prosecution, by itself and without more information, is not an "active investigation" within the meaning of subdivision (a). The text of Senate Bill No. 1421 is instructive. As discussed, *ante*, the same Legislature that passed Assembly Bill No. 748 also passed Senate Bill No. 1421, which, as relevant here, amended the Penal Code's provisions regarding public disclosure of information contained in peace officer personnel records. Now, in some situations when the investigation or proceeding against an officer who engaged in misconduct is no longer active, a law enforcement agency must make available for public inspection certain records that were being withheld. (Pen. Code, § 832.7, subd. (b)(1), (8)(A)(ii).) Relatedly, in some situations when there is an active and ongoing criminal investigation or proceeding against someone other than an officer who engaged in misconduct, a law enforcement agency must show by clear and convincing evidence that the interest in preventing prejudice to the active and ongoing criminal investigation or proceeding

---

[14] To the extent the City may have forfeited this issue, we exercise our discretion to excuse the forfeiture because this matter presents an important legal issue.
(See *Cleveland National Forest Foundation v. San Diego Assn. of Governments* (2017) 17 Cal.App.5th 413, 434 ["application of the forfeiture rule is not automatic and we may excuse forfeiture in cases presenting 'an important legal issue' "].)

[15] Though the City suggested below that the superior court could not order the release of additional recordings "without violating" the trial court's sealing order, the City does not raise this argument here.

15

outweighs the public interest in making certain records about the misconduct available for public inspection. (*Id.*, § 832.7, subd. (b)(8)(A)(iii).)

Senate Bill No. 1421 reflects the Legislature's understanding that a "proceeding" is sometimes distinct from an "investigation." The legislative history of Assembly Bill No. 748 buttresses this notion. As discussed, *ante*, one committee analysis noted that an organization opposed to the legislation was concerned that it failed "to adequately protect ongoing investigations *or active prosecutions*." (Assem. Com. on Privacy and Consumer Protection, Analysis of Assem. Bill No. 748, *supra*, p. 7, italics added.) By contrast, the City in its return appears to conflate the two concepts without much analysis. The City also argues that "[t]here is good reason to interpret" the word " 'investigation' " used in subdivision (a) as including "investigations done by or on behalf of a defendant in a criminal matter." In support of this reading, the City observes that the prosecution and a criminal defendant have reciprocal disclosure obligations, which exist in part to ensure that any conviction is fairly based on a full disclosure of critical facts. We are not persuaded. CPRA's intricate scheme regarding "investigations" is about investigations by government agencies, not investigations by criminal defendants. (See § 7923.600, subd. (a) [the investigatory records exemption applies to "investigations conducted by, or records of . . . any state or local police agency, or . . . any investigatory or security files compiled by any other state or local agency for correctional, law enforcement, or licensing purposes"]; cf. *Coronado Police Officers Assn. v. Carroll* (2003) 106 Cal.App.4th 1001, 1005-1008 [information in a database stored by a county public defender's office is not a CPRA public record because the "core function" of the database, the representation of indigent criminal defendants, "is a private function"].) The protection of a criminal defendant's rights is a matter for a judge presiding over that criminal matter, not a judge in a writ proceeding to which the criminal defendant is not a party.

And while there may be times when there is an active investigation and there is *also* a pending criminal prosecution, the evidence presented to the superior court here does not amount to substantial evidence that such a scenario existed when the superior court ruled. The totality of the evidence appears to consist of statements in a declaration by Abril's prosecutor that it was the People's concern that the release of certain images presented at Abril's preliminary hearing "would create traumatic publicity for the victims and would greatly impair" Abril's "ability to receive a fair jury trial."[16] A prosecutor's stated concerns about victim trauma and impairment of a criminal defendant's right to a fair trial in a pending criminal prosecution, however legitimate, do not—without more detail—demonstrate how disclosure of certain recordings will substantially interfere with an active investigation. (Cf. *Becerra*, *supra*, 44 Cal.App.5th at p. 930 [ruling in a CPRA matter that the declaration of a senior assistant attorney general "was lacking in meaningful detail" and "fell short of demonstrating that public fiscal and administrative concerns . . . clearly outweigh[ed] the public interest in disclosure"]; *id*. at p. 931 [the declaration "alluded to" certain matters "but . . . provided no specifics"].)[17]

---

[16] To the extent the City contends the trial court's sealing order (which referenced an "on-going investigation") was evidence of an active investigation within the meaning of subdivision (a), that contention is misplaced. (See *Grant-Burton v. Covenant Care, Inc.* (2002) 99 Cal.App.4th 1361, 1379 [a "trial court's explanation of its decision—whether by order, statement of decision, judgment, oral pronouncement, or other form—is not evidence," and "[f]actual assertions on appeal cannot rest solely on citations to the decision of the trial court," because "[i]t is the evidence supporting or opposing the trial court's decision that is important"].)

[17] The amici brief in support of the City argues the superior court did not err because (1) "an investigation is not closed until either the suspect is cleared of wrongdoing or the case has resulted in a conviction or acquittal" and (2) prosecutors "*will frequently* . . . perform . . . investigatory activities up to the time of trial." (Italics added.) The operative question here is whether the City presented sufficient evidence to the superior court that there was in fact an active investigation within the meaning of subdivision (a).

17

C.	*"An Incident Involving the Discharge of a Firearm"*

Given its finding that an exemption applied, the superior court declined to determine how much additional disclosure subdivision (e) required in this dispute. We agree with the superior court that subdivision (e) required more disclosure. However, because the "active investigation" finding was erroneous, the superior court must now determine how much more disclosure is required.

1.	*Proposed Constructions of Subdivision (e)*

Sac TV contends the word " 'involving' " is "capacious[,] not stingy," and therefore subdivision (e) requires disclosure of footage "from the time that [Roseville PD] arrived on scene at the critical incident to the time the scene was secured." Sac TV further contends that the City's interpretation of subdivision (e) "reads the words 'incident involving' out of" the statutory text by taking the position that it must disclose only those recordings that depict the discharge of a firearm.

The amici brief in support of Sac TV argues Assembly Bill No. 748 requires disclosure of recordings that depict "the totality of circumstances before and after a police shooting." (Capitalization & boldface omitted.) Among those circumstances, the brief suggests, is sufficient "post-shooting" footage to confirm that law enforcement officers "promptly rendered first aid, secured the scene, and refrained from contaminating or planting evidence." The brief contends that this footage is "essential to fulfilling [Assembly Bill No.] 748's mandate of increasing transparency and building community trust in law enforcement."

The City takes the position in its return that the phrase " 'incident involving the discharge of a firearm at a person by a peace officer' " in subdivision (e) means "the context leading up to the discharge, the discharge itself, and the officer's disengagement following the discharge—here no more than thirty-nine (39) seconds for each discharge." As it did before the superior court, the City draws a distinction between the " 'critical incident' " that section 7923.625 is concerned with and the "larger criminal event" during

18

which the critical incident transpired.  In the City's view, an incident involving a firearm discharge is a "situation that is a separate unit of experience that includes a firearm discharge."

Similarly, the amici brief in support of the City argues the April 6 occurrence encompassed "a series of incidents," of which the officer-involved shooting was just one. Under this view, Abril's arrest was a distinct incident, as was the effort to render medical aid to the victims.  As for the meaning of the words "incident" and "involving" in subdivision (e)(1), the amicus brief contends the word " 'involving' " is "merely a modifier that identifies the type of incidents that are subject to disclosure," while the word " 'incident' "—which one dictionary defines as a "discr[ete] occurrence or happening"—is "the operative term" in the phrase.

### 2. *Analysis of the Proposed Constructions of Subdivision (e)*

We find the construction of subdivision (e) proposed by amici for Sac TV to be too broad, and the construction proposed by the City and its amici, while perhaps acceptable in the abstract, to be too narrow as applied here.  Although Sac TV's proposed construction may ultimately prove to be right in this case, we are not convinced it offers the best articulation of a legal rule flexible enough to reflect the relevant legislative intent.  Rather than attempt, in the abstract, to draw temporal bright lines defining the starting point and endpoint of an "incident involving" an officer's discharge of a firearm at a person within the meaning of subdivision (e),[18] we will direct the superior court to determine—after an in camera review of the City's unedited recordings—what more the

---

[18]  See *Tharp v. Superior Court* (1984) 154 Cal.App.3d 215, 219 and footnote 8 ["finding a bright line of demarcation to provide courts with guidelines in applying" Penal Code section 995a, subdivision (b)—which allows a court to order further proceedings to correct errors in an information if the court finds they are "minor errors of omission, ambiguity, or technical defect"—"is an impossible task," as the statute "lends itself to an 'I know it when I see it' approach"].)

19

City must disclose in light of subdivision (b)'s signal regarding the importance the Legislature placed on a "viewer's ability to fully, completely, and accurately comprehend the events captured" in a recording that "relates to a critical incident." (§ 7923.625, subd. (b)(1); see *McHugh v. Protective Life Ins. Co.* (2021) 12 Cal.5th 213, 227 [when seeking to "determine and give effect to the Legislature's underlying purpose in enacting the statute[] at issue," courts must consider "related provisions" and "terms used in other parts of the statute"]; *City of San Jose*, *supra*, 2 Cal.5th at p. 617 [courts should construe legislative text within the context of the entire statutory scheme to harmonize the various parts of a legislative enactment and give significance to every word, phrase, and sentence].)

The construction proposed by amici for Sac TV is overbroad because it includes conduct that neither the statutory text nor the legislative history supports including. While members of the public may be interested in viewing post-shooting footage of officers providing first aid to the wounded and collecting evidence after a shooting, amici point to nothing in the text or the legislative history of Assembly Bill No. 748 that supports the notion the Legislature intended to categorically require disclosure of such post-shooting footage. Rather, amici point to uncodified legislative findings in a *different* bill—Senate Bill No. 1421—accompanied by the unsupported assertion that the Legislature adopted Assembly Bill No. 748 for similar reasons. We are not convinced. If the Legislature wanted to require public agencies to disclose footage concerning these kinds of acts, it could have said so. Further, absent a clear indication to the contrary from the Legislature, each bill that becomes law stands on its own and is a result of compromises to which the judicial branch will not always be privy. Thus, it is not for us to import the uncodified legislative findings of one bill into another. (Cf. *State Dept. of Public Health v. Superior Court* (2015) 60 Cal.4th 940, 956 [when harmonizing potentially inconsistent statutes, courts do not have a "license to redraft the statutes to strike a compromise that the Legislature did not reach"].)

20

The construction proposed by the City and its amici is too narrow as applied here because, as the superior court reasoned below, mere seconds of context surrounding an officer's discharge of a firearm will rarely if ever be sufficient to understand what happened. (Cf. *People v. Holford* (2012) 203 Cal.App.4th 155, 179 [" 'People who hear a story interrupted by gaps of abstraction may be puzzled at the missing chapters' " (italics omitted)]; *California First Amendment Coalition v. Superior Court* (1998) 67 Cal.App.4th 159, 174 ["the facts which drive our legal conclusions" are distilled from the "basic generalized knowledge . . . regarding human affairs, and the way the world works"].) There is no reason to believe that, with the passage of Assembly Bill No. 748, the Legislature sought merely to require the disclosure of decontextualized, atomized data. (See *City of San Jose*, *supra*, 2 Cal.5th at p. 617 [a statute should be broadly construed if it furthers the people's right of access, and narrowly construed if it limits the right of access].) Sufficient context preceding a peace officer's discharge of a firearm at a person is essential to understanding what occurred—just as sufficient context following the final shot is. (Cf. *Munchkin, Inc. v. Tomy Int'l, Inc*. (N.D. Ill. 2024) 713 F.Supp.3d 452, 456 [" 'the end of a movie is more than the final frame' "; " 'it is the denouement of the story arc,' " and " 'may span a few . . . scenes' "].)

Accordingly, it is difficult to imagine how Sac TV would be entitled here to anything less than (a) *uninterrupted* copies of *all* Roseville PD recordings of the April 6 occurrence that were captured during the three-minute window of time when, the City alleges, the entire incident involving firearm discharge by Roseville PD took place, along with (b) additional recordings that provide sufficient context to permit an understanding of why the first shot was fired and what happened in the immediate aftermath of the final shot. After conducting an in camera review of the City's unedited recordings, the superior court will be in the best position to determine precisely how much more audio and video footage the City must disclose to Sac TV. An adoption of Sac TV's inflexible interpretation of subdivision (e) would short circuit that process. A determination of the

21

amount of context sufficient to understand a recording of an officer's firearm discharge is something best made after examination of the unedited recording.[19]

### D. *City's Other Contentions*

#### 1. *"Good Faith"*

Citing *American Civil Liberties Union of Northern California v. Superior Court* (2011) 202 Cal.App.4th 55, 85, the City contends (a) it is entitled to a presumption that it acted in good faith and (b) this presumption includes the notion that it has already disclosed "all recordings showing the context for each firearm discharge." The cited case supports the first proposition but not the second: "Government agencies are . . . entitled to a presumption that they have . . . in good faith complied" with their CPRA disclosure obligations, "[b]ut that presumption *cannot . . . obstruct*" CPRA's "prodisclosure purposes." (*American Civil Liberties Union of Northern California*, at p. 85, italics added.) Further, the City offers no reasoning why its "good faith" is material to the legal questions presented. An insufficient disclosure resulting from a public agency's incorrect interpretation of CPRA, even when done in good faith, remains an insufficient disclosure. (Cf. *Pacific Merchant Shipping Assn. v. Board of Pilot Commissioners etc.* (2015) 242 Cal.App.4th 1043, 1059 ["good faith legal arguments in opposition to CPRA coverage are hardly comparable" to "good faith efforts to fully and timely respond to a records request" (italics omitted)].)

---

[19] Accordingly, we reject Sac TV's contention that an in camera review would "serve no purpose here." Further, we need not resolve the parties' disagreement regarding whose position is supported by "public policy," because we believe the statutory language and legislative history are sufficient to resolve the questions presented. (See *Tuolumne Jobs & Small Business Alliance v. Superior Court* (2014) 59 Cal.4th 1029, 1043 ["if statutory language and legislative history are unclear, courts may look to public policy as an aid in determining legislative intent"]; *In re Firearm Cases* (2005) 126 Cal.App.4th 959, 986 ["the concept of public policy is difficult to define, and courts should hesitate" to opine on the question, "especially in an area that is subject to heavy regulation"].)

### 2.    *Catchall Provision*

In its answer to the amici brief in support of Sac TV, the City contends CPRA's catchall exemption also permits withholding the additional records sought by Sac TV. CPRA's catchall exemption, section 7922.000, "permits a public agency to withhold a public record under the CPRA if the agency demonstrates 'that on the facts of the particular case the public interest served by not disclosing the record clearly outweighs the public interest served by disclosure of the record.' " (*Castañares v. Superior Court*, *supra*, 98 Cal.App.5th at p. 313.)

The City did not present this theory in its superior court pleadings and made a passing reference to it at oral argument. That is insufficient to preserve the issue for our review. (See *Rancho Pauma Mutual Water Co. v. Yuima Municipal Water Dist.* (2015) 239 Cal.App.4th 109, 118-119 [raising an issue for the first time at oral argument in the trial court "in a case involving numerous documents is insufficient to preserve the issue" for appeal].) We excused any forfeiture by the City on the applicability of the "active investigation" exemption under subdivision (a) (*infra*, fn. 14) because it presented an important legal question of first impression. Further, the superior court ruled on it. Here, by contrast, the applicability of the catchall exemption does not present a question of first impression, and the superior court did not rule on it. Accordingly, we will not consider the argument now. (See *Humane Society of U.S. v. Superior Court* (2013) 214 Cal.App.4th 1233, 1253, 1272-1273 [declining to consider a new legal theory raised for the first time on review of a CPRA ruling].)

### 3.    *Third-party Privacy*

The City contends, apparently for the first time in this dispute, that subdivision (b)(1) protects from disclosure the additional records Sac TV seeks. Specifically, the City asserts that the recordings it seeks to withhold show Abril's hostages during the April 6 occurrence. The City further asserts the hostages' privacy interests "clearly outweighs the public's interest in disclosure," and subdivision (b)(1) "provides only that

23

an agency 'may' use redaction technology, not that it must." Like its argument regarding the catchall provision, the City's third-party privacy argument is forfeited because it was not raised in the superior court. However, we will exercise our discretion to consider it because it presents a straightforward legal question of first impression. (See *Cleveland National Forest Foundation v. San Diego Assn. of Governments*, *supra*, 17 Cal.App.5th at p. 434.)

The City's argument is unpersuasive. The word "may" in subdivision (b)(1) does not grant to an agency the discretion to withhold a recording in its entirety; it grants to an agency the discretion to *alter* a recording to protect the privacy interests of someone depicted in the recording. (See § 7923.625, subd. (b)(1) [if the public interest in withholding a recording, because release would "violate the reasonable expectation of privacy of a subject depicted in the recording," clearly outweighs the public interest in disclosure, an agency "may use redaction technology, including blurring or distorting images or audio, to obscure *those specific portions of the recording that protect that interest*" (italics added)].) The legislative history supports the conclusion that subdivision (b)(1) requires redaction, if possible. (See Assem. Com. on Privacy and Consumer Protection, Analysis of Assem. Bill No. 748, *supra*, p. 6 [if "a subject's privacy would be violated by release of the video, the bill would *require* redaction of the subject, if possible, prior to releasing the footage" (italics added)]; cf. *Tarrant Bell Property, LLC v. Superior Court* (2011) 51 Cal.4th 538, 542 [to determine whether the Legislature intended a statute to be mandatory or permissive, use of "may" is merely indicative, not dispositive or conclusive; we properly consider the legislative intent, including relevant legislative history].) Subdivision (b)(2), by contrast, does grant to an agency the discretion to withhold a recording in its entirety, but only after demonstrating that the reasonable privacy interests of someone depicted in the recording "cannot adequately be protected through redaction as described in" subdivision (b)(1). (§ 7923.625, subd. (b)(2).) Accordingly, the City's contentions are unavailing.

24

# DISPOSITION

Sac TV's petition for writ of mandate is granted. Let a peremptory writ of mandate issue directing the respondent superior court to (1) vacate its October 2024 ruling that the "active investigation" exemption of subdivision (a) applies to Sac TV's request for disclosure of the City's recordings of the April 6 occurrence and (2) hold further proceedings, including an in camera examination of the City's recordings, consistent with the reasoning in this opinion.[20] Sac TV is entitled to its costs in this proceeding. (Cal. Rules of Court, rule 8.493.)

/s/
BOULWARE EURIE, Acting P. J.

We concur:


/s/
MESIWALA J.


/s/
WISEMAN, J.[*]

---

[20] " 'Although "[t]he writ to be issued does not exactly conform to the prayer of the petition; . . . this court is not limited by the prayer, and may grant the relief it deems appropriate." ' " (*Erickson v. Superior Court* (1997) 55 Cal.App.4th 755, 759.)

[*] Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.